**GRESHAM & COMPANY, INC.**

v.

**The UNITED STATES.**

No. 363–70.

United States Court of Claims.

Dec. 12, 1972.

Clarence T. Kipps, Jr., Washington, D. C., for plaintiff. Barron K. Grier, Washington, D. C., attorney of record for plaintiff. Gary G. Quintiere, Washington, D. C., and Wendell S. Holmes, Hutchinson, Kan., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This is a Wunderlich Act (41 U.S.C. §§ 321–22 (1964)) review case that comes before the court on the parties' cross motions for summary judgment. The decision below is ASBCA Nos. 13812 and 13865, 70–1 BCA § 8318. Jurisdiction is conferred by 28 U.S.C. § 1491. Commissioner William E. Day, by order of the court under Rule 166(c), has reviewed the record and submitted a recommended opinion. We reach the same result as he by a somewhat different route, but have used large parts of his text and acknowledge the able assistance he has rendered.

Plaintiff entered into nine contracts between May and December 1967:

| | | | |
|---|---|---|---|
| 5–11–67 | DSA–400–67–C–8531 | 21 | units |
| 6– 7–67 | DSA–400–67–C–9325 | 220 | '' |
| 8–11–67 | DSA–400–68–C–0559 | 17 | '' |
| 8–16–67 | DSA–400–68–C–0689 | 35 | '' |
| 8–30–67 | DSA–400–68–C–0942 | 34 | '' |
| 10–10–67 | DSA–400–68–C–1767 | 7 | '' |
| 11–16–67 | DSA–400–68–C–2467 | 19 | '' |
| 11–28–67 | DSA–400–68–C–2650 | 11 | '' |
| 12– 8–67 | DSA–400–68–C–2927 | 34 | '' |

and six additional contracts between January and June 1968:

| | | | |
|---|---|---|---|
| 1–10–68 | DSA–400–68–C–3555 | 22 | units |
| 2– 7–68 | DSA–400–68–C–4163 | 7 | '' |
| 3– 4–68 | DSA–400–68–C–4700 | 160 | '' |
| 4– 2–68 | DSA–400–68–C–5238 | 5 | '' |
| 5–23–68 | DSA–400–68–C–6266 | 12 | '' |
| 6–10–68 | DSA–400–68–C–6556 | 6 | '' |

With the United States, acting through the Defense General Supply Center (hereinafter DGSC), Richmond, Virginia, for the manufacture and supply of 610 single tank dishwashing machines. All 15 contracts were awarded under Federal Specification OO–D–431b, as modified by Amendment 2. During the course of a Government audit in April 1968, the product quality auditor discovered that the dishwashing machines manufactured by plaintiff were not fitted with automatic detergent dispensers. Thereafter, the contracting officer determined that dispensers were required by the specifications and directed that all machines to be delivered under the six contracts must be equipped with automatic detergent dispensers. Plaintiff complied with the directive and requested an · equitable adjustment under the standard Changes Clause for the increased costs incurred in furnishing the machines with dispensers. The request was denied and plaintiff's timely appeal to the Armed Services Board of Contract Appeals (ASBCA) was docketed ASBCA No. 13812.

The contracting officer further asserted that plaintiff's failure to fit machines with dispensers under the previous nine contracts was a breach of its warranty to furnish goods in conformance with the specifications. Consequently, he demanded a price reduction for each machine delivered under the nine contracts which was not fitted with a dispenser. Plaintiff disclaimed any breach of warranty and appealed the contracting officer's assessment to the Board, which docketed the case ASBCA No. 13865. In light of the common factual background and issues underlying each dispute, the Board consolidated the two appeals and following a full hearing rendered a decision on May 20, 1970, sustaining both decisions of the contracting officer.

Generally stated, plaintiff now argues in this court that the 15 contracts in question, when read in light of the specifications and the contracting practice of the parties, did not when awarded require that single tank dishwashing machines be fitted with automatic detergent dispensers. Plaintiff challenges the Board's interpretation of the contract provisions in dispute and contends that the Board committed reversible errors both in its findings of fact and conclusions of law. Thus, plaintiff asserts, the Board's decision is not entitled to finality under the standards prescribed by the Wunderlich Act. The pertinent facts, relevant specification and amendments, and contentions of the parties are set forth below. The history of the parties' correspondence and the plaintiff's performance of contracts prior to those in dispute will first be discussed before deciding the merits of the parties' arguments pertaining to the 15 contracts in controversy.

Plaintiff, a Missouri corporation with its principal place of business in Kansas City, Missouri, is a fabricator of steel, aluminum and stainless steel products. Between 1950 and 1968, it had supplied defendant with more than 6,000 single tank dishwashing machines pursuant to numerous contracts. During this period plaintiff's engineering staff worked closely with technical personnel in the procurement agencies in the development of a commercial dishwashing machine at a reasonable cost. Because of its extensive trade experience, plaintiff was often invited to offer its comments and recommendations on major proposed revisions

to dishwashing machine specifications. Without requesting industry guidance or assistance, defendant issued Federal Specification OO–D–431b (hereinafter referred to as specification 431b), entitled "Dishwashing Machines, Commercial (Rack, Conveyor and Stationary)," on May 22, 1964. Specification 431b was later modified by the issuance of Interim Amendment 1 on September 22, 1964, and Amendment 2 on November 23, 1965. The basic specification and its modifications read in pertinent part as follows:

3.2 Standard product. Except as specified herein, the dishwashing machine and its component parts shall be a regular commercial product of the manufacturer or his suppliers. * *

\* \* \* \* \* \*

3.7.17 Detergent control. Unless otherwise specified (see 6.2), the dishwashing machine shall be fitted with an electric or electronic automatic detergent dispenser. [The language "Unless otherwise specified (see 6.2)," was deleted by Amendment 2].

3.7.17.1 Automatic detergent dispenser. The detergent dispenser shall consist of a detergent reservoir * *.

3.7.17.2 Detergent concentration meter. When specified (see 6.2), a detergent concentration meter conforming to MIL–M–11495 and all accessories necessary for proper operation shall be supplied with each machine but not installed. * * * [Deleted in its entirety by Amendment 2].

\* \* \* \* \* \*

6.2 Ordering data. Purchasers should exercise any desired options offered herein and procurement documents should specify the following:

\* \* \* \* \* \*

(l) Specify when an automatic detergent dispenser is not required (see 3.7.17). [Subparagraph (l) was deleted by Amendment 2].

(m) Detergent concentration meter, when required (see 3.17.2). [The reference should be to 3.7.-

17.2. Subparagraph (m) was deleted by Amendment 2].

OO–D–431b was a coordinated specification which had been accepted by the General Services Administration for use by all Federal agencies. See ASPR 5.-1101—1–1101–4 and 5–1106–5 (32 C.F. R. §§ 5.1101—1–1101–4 and § 5.1106–5 (revised 1/1/72)). Such specifications do not necessarily reflect the wishes of the procuring or using agency, which is in no position to alter them at will.

Although specification 431b was designed to cover both single and double tank dishwashing machines, plaintiff considered the dispenser requirement in paragraph 3.7.17 an unintentional overgeneralization in drafting by the Government and concluded that the requirement to furnish dispensers applied only to double tank machines. This reasoning was based upon plaintiff's prior experience in manufacturing single tank dishwashing machines without dispensers and interpreting numerous specifications for dishwashing machine procurement. Plaintiff points out that preceding Federal specifications varied in coverage— some applying to single tank machines only and others applying to both single and double tank machines. Plaintiff says that dual coverage or single and double tank specifications required dispensers only when specified by the ordering data in the invitation for bid and that single tank specifications never made reference to dispensers. Under the preceding specifications, plaintiff's witness testified that plaintiff never furnished defendant with a single tank machine fitted with a dispenser and that none of its contracts ever specified such a requirement.

Plaintiff sets forth in its brief five reasons for not requiring automatic detergent dispensers on single tank machines. Without discussing the merits of each reason, it will contribute to an understanding of plaintiff's position to list them here, as follows:

1. Dispensers are considered accessories and are unnecessary on single tank machines.

2. Automatic detergent dispensers require regular monthly servicing which is usually ignored.

3. Dispensers were never required on commercial machines by the trade practice.

4. One of the two functions performed by a dispenser (i. e. measuring the concentration of detergent in the water) could be performed equally well by a less expensive detergent concentration meter, which was commonly required on single tank machines.

5. The Government could procure a dispenser more economically by purchasing it directly from the detergent manufacturer, rather than indirectly from the washing machine supplier.

The newly issued specification caused many interpretation problems for plaintiff and other dishwashing machine manufacturers. Beginning in August 1964, plaintiff initiated an extended exchange of correspondence with DGSC and other related Federal agencies seeking clarification of the new specification, offering constructive comments, and indicating its willingness to provide assistance in the preparation of a revised specification. Plaintiff's letters were acknowledged by the respective agencies, but no clear, meaningful and unequivocal answer was ever received before the dispute arose with respect to the dispenser issue.

The actual communications between the parties are summarized in the Board's opinion and may be found in detail in the exhibits. For our purposes, excerpts from these letters will be quoted in discussing the background underlying this dispute. The reason that the correspondence will be laboriously outlined below is that both parties and the Board rely heavily upon it for support of their respective contentions.

On August 5, 1964, plaintiff wrote a protest letter to the Director of Procurement and Production, DGSC, Richmond, Virginia. That letter reads in pertinent part:

Re: Federal Specification OO–D–431–B
May 22, 1964

Reference is made to the subject Federal Specification for commercial dishwashing machines, both single and double tank units, which was recently promulgated.

When we first saw this specification, we understood that numerous questions had been raised as to the proper interpretation of many provisions and as to the necessity of certain requirements, all of which would be subject to further review and clarification before the specification would be used for procurement. Accordingly, we took no further action, and assumed that we would be afforded an opportunity to comment thereon before its final adoption.

We now find that your office is using this new Federal Specification in lieu of Interim Purchase Description S–90–2 in your IFB–DSA–4–65–10 and IFB–DSA–4–65–215. While these two invitations cover double tank machines (which we do not manufacture), it is assumed that the new specification is to be used in the procurement of single tank machines, unless current directives are modified.

Therefore, before you issue an IFB for a requirement of single tank units, using Federal Specification OO–D–431–B (May 22, 1964), we do want to register our "protest" against using this specification until it has been clarified and revised to call for a workable, serviceable and practical dishwashing unit at a reasonable price. Frankly, this specification as written is not in harmony with Secretary McNamara's program and policy of practical equipment at reasonable defense budget costs. We are in sympathy with the overall of standardization in government procurement, and thus in accord with the adoption of Federal Specifications wherever possible. However, since the Defense Department has the primary interest in dish-

washing machines of the general type covered by the subject specification, it should necessarily follow that the needs of the Defense Department should also be controlling if the latter department is to adopt and use a Federal specification.

We have manufactured over 7,000 single tank dishwashing machines for the Defense Department since 1950. By reason of this extensive experience, and our constant willingness to cooperate with research and development and procurement personnel, we have always been invited to furnish comments and suggestions on all major modifications of specifications for dishwashing machines which were being considered by the Army and the Air Force. Yet we have never been afforded an opportunity to comment on this new Federal Specification, and have been unable to find any other members of the industry (regularly manufacturing single tank machines) who has.

\* \* \* \* \* \*

A memorandum from plaintiff's chief engineer, Clancy V. Marks, was enclosed with the August 5 letter. Mr. Marks discussed many of the conceivable problems with the new specification and made the following observation regarding dispensers:

3.7.17 and 3.7.17.1 Provide for and call out that "machine shall be fitted with an electric or electronic automatic detergent dispenser" "unless otherwise specified". I believe to conform to this requirement as stated that this would become an integral part of the machine. This would, no doubt, require resubmission to U.L. [Underwriters' Laboratories].

DGSC acknowledged plaintiff's protest letter and memorandum on August 7, 1964, and stated that "[y]our letter is being studied and advice will be furnished you upon completion of the evaluation of same." On August 14, 1964, plaintiff forwarded copies of its correspondence with DGSC to the Defense Supply Agency (hereinafter DSA) at Cameron Station, Alexandria, Virginia.

A meeting was held by defendant's representatives in Richmond, Virginia, on August 19, 1964, for the purpose of establishing military requirements for the procurement of dishwashing machines and discussing industry comments and recommended changes in the specification. The minutes of the meeting illustrate the differing needs of the representatives. The minutes read in part as follows:

10. Page 26—para. 3.7.17—The Army stated that they desire the detergent concentration meter as reflected in para. 3.7.17.2 and not the automatic detergent dispenser reflected in para. 3.7.17.1. As a result of conflicting opinions involving decisions expressed by the medical departments in meetings by the Ad Hoc Committee on Food Service Equipment, the Army will check with the Surgeon General's office 20 August 1964 for clarification and notify the Chairman same date.

On August 25, 1964, plaintiff wrote DGSC regarding the outcome of the meeting and requested a copy of the revised specification. DSA advised plaintiff by letter dated August 26, 1964, that an interim amendment to specification 431b would be issued incorporating many of the recommendations submitted by plaintiff.

On September 3, 1964, plaintiff acknowledged DSA's August 26, 1964 letter and expressed its interest and willingness to assist in any way possible in the preparation of the new specification at any time. Plaintiff also wrote to DGSC on September 3 and offered to provide assistance with regard to a revised specification.

The defendant's representatives held a subsequent meeting in Bayonne, New Jersey in early September to further discuss proposed changes. Thereafter, Interim Amendment 1 was issued (on September 22, 1964), but the modifications

did not affect that part of the specification relating to the automatic detergent dispenser.

On October 30, 1964, plaintiff wrote to DGSC and DSA regarding Interim Amendment 1 and enclosed a recent report prepared by Mr. Marks. Concerning the dispenser requirement the chief engineer stated: "No change in the Amendment so original comments stand." DSA acknowledged plaintiff's foregoing letter on November 6, 1964, and stated:

A copy of your comments has been forwarded to the Defense General Supply Center * * *. If any additional information or data is needed, the DGSC of the Bureau of Yards & Docks, U.S. Navy will contact you directly.

On February 17, 1965, plaintiff wrote to DGSC and DSA seeking guidance in bidding IFB DSA–4–65–1495 (with an opening date of March 12, 1965) and requesting clarification of the requirements of specification 531b, as modified by Interim Amendment 1. Attached to the letter were comments by plaintiff's chief engineer concerning the invitation and the specification:

3.7.17.1. We suggest the review of para. 6.2, line (l), and para. 3.7.17. Under these, if not otherwise specified, the machines would have to be equipped with an automatic detergent dispensing system. This is quite involved and an expensive system that heretofore has not been purchased as part of the machine, to the best of my knowledge. It is not done in normal commercial practice either, we believe.

Current Government procurement practice we have experienced has been with the detergent meter referred to in para. 6.2, line (m), and para. 3.17.2. We recommend this arrangement as the most satisfactory, and proven, procedure.

According to plaintiff the above IFB specified a detergent concentration meter. In light of this requirement Mr. Marks also stated in his comments:

* * * We assume, as in commercial practice, that exercise of this option automatically means that the automatic detergent dispenser (re: para. 6.2, line l) is not required.

By letter dated March 4, 1965, Mr. E. B. Odom, DGSC contracting officer, wrote a paragraph-by-paragraph answer to the questions in plaintiff's letter of February 17. Regarding the automatic detergent dispenser, Mr. Odom responded:

b. Re: All items and "with detergent concentration meter". This means that the detergent concentration meter is to be furnished in addition to the automatic detergent dispenser.

* * * * * *

i. Para. 3.7.17.1—Machines are to be fitted with an automatic detergent dispenser.

* * * * * *

Appearing in the right margin adjacent to each of the above paragraphs [b. and i.] was the handwritten notation "Rewrite." Mr. Arthur H. Cromb (plaintiff's president) testified that he had received the Government's March 4, 1965 letter with the word "Rewrite" quoted on it twice, and that he had no idea who wrote it on there. Understandably, plaintiff describes the notations and Mr. Odom's advice to furnish both concentration meters and detergent dispensers as puzzling and confusing.

On March 5, 1965, DSA acknowledged plaintiff's letter of February 17, 1965, and stated in part:

The Defense General Supply Center advises me that you have been in touch with the contracting officer and he is currently clarifying the IFB 4–65–1495 including the specification requirements prior to your submission of a bid.

In addition, we are requesting DGSC to take action with the Navy, who is the specification preparing activity, to review the specification and amendment to ensure clarity for future procurements.

Your continued interest is appreciated.

Plaintiff followed Mr. Odom's advice, bidding DSA–4–65–1495 with cost allowances for both a dispenser and a meter, but was unsuccessful on this bid. IFB DSA–4–65–2678 was later announced with an opening date of June 28, 1965. Plaintiff again bid with cost allowances for both a dispenser and a meter and again was unsuccessful.

On July 7, 1965, plaintiff wrote DGSC regarding the requirements of the IFB DSA–4–65–2678 and stated in pertinent part:

In view of the questions which have arisen as to the meaning of certain parts of Federal Specification OO–D–431–b, we are naturally concerned if all bidders are following the same specification requirements.

Particularly, we are concerned as to two items—racks and the detergent dispenser—per the attached memo.

We trust that the contract for machines awarded under this I.F.B. will require these two items per the interpretation given us by D.G.S.C. and hence considered in the computation of the bid.

Again, thanks for the opportunity to bid.

A memorandum from the chief engineer was attached to plaintiff's July 7 letter and stated in part:

2. Par. 3.7.17 calls out that unless otherwise specified, the dishwashing machine shall be fit with an electric or electronic automatic detergent dispenser. Par. 3.7.17.1 describes this dispenser system and its installation very clearly. It sets up some very stringent performance requirements. Our questions [sic] has been the advisability, and practicability, of the manufacturer installing this equipment on a machine of the type we build. Also, we questioned whether the detergent dispenser is intended to be required when the detergent meter is specified under Par. 3.7.17.2, which they nearly always do. This was, also, interpreted by DGSC as requiring the detergent dispenser on every machine.

In view of the unsuccessful March and July bids and the absence of a satisfactory response to its many requests for clarification, and believing that its competitors did not furnish dispensers with single tank machines, plaintiff concluded that its interpretation was correct and did not include the cost of dispensers in subsequent bids.

On November 23, 1965, Amendment 2 was issued. The defendant argues in its brief that the specification, as amended, clearly and unambiguously sets forth the dispenser requirement in paragraph 3.7.17:

The dishwashing machine shall be fitted with an electric or electronic automatic detergent dispenser.

The Board had reached the same conclusion on the basis of the following analysis, 70–1 BCA at p. 38,692:

The specification is not vague, misleading or ambiguous. It specifically requires in Paragraph 3.7.17 detergent dispensers. If it was contrary to trade customs to make single tank machines with dispensers, the cited paragraph constitutes a specified exception from the "Standard Products" clause (Par. 3.2) and, hence, compliance therewith was required. Nothing in the specification limits the requirement of detergent dispensers to double tank machines. Nothing in the specification suggests that with respect to single tank machines the dispenser is accessory equipment to be ordered only when specified in the IFB. The specification admits to no ambiguity.

There is uncontradicted evidence that, besides plaintiff, as will appear, at least one other supplier was allowed to furnish machines without the automatic detergent dispensers, and despite a Board inquiry during trial, there was no clear proof one way or the other, as to the other and remaining suppliers.

Before November 23, 1965, plaintiff had submitted bids on other IFBs without including the cost of detergent dispensers. During the period February 24, 1965, to March 28, 1966, plaintiff

was awarded 36 contracts for a total of 254 single tank dishwashing machines, under specification 431b, as modified by Interim Amendment 1. One of these contracts (DSA–4–092381 dated January 31, 1966) called for the delivery of 38 machines and required plaintiff to furnish a preproduction model for inspection. The contract was assigned to Defense Contract Administration Services Office (hereinafter DCASO), Kansas City, Missouri, for administration and the letter of, assignment expressly directed that quality assurance functions be performed by quality assurance representatives (hereinafter QAR). Two Government QARs (William R. Moore and Robert L. Kalen) were successively assigned to plaintiff's plant to inspect preproduction samples and approve machines that complied with the contract requirements.

On February 28 and March 1, 1966, Mr. Moore inspected plaintiff's preproduction samples for contract DSA–4–092381. During the preproduction inspection, he raised questions with plaintiff's contract administrator (Cal M. Bailey) about the absence of an automatic detergent dispenser. Mr. Bailey explained plaintiff's interpretation of the specifications and its reasons for not fitting the machines with dispensers. Mr. Moore testified at the hearing that plaintiff's arguments appeared to be valid and persuasive particularly in light of the fact that the machines were equipped with a detergent meter.

Mr. Moore also discussed this matter with his superior (Bernard J. Shea, Southern Branch Supervisor, Quality Assurance Division, DCASO, Kansas City, Missouri). Following these discussions, the QAR approved the preproduction samples and prepared an inspection report but did not take exception to or mention the absence of the detergent dispenser. The report was forwarded to DGSC, Richmond, Virginia, on March 2, 1966, by Glenn M. Lasher (Administrative Contracting Officer, DCASO, Kansas City, Missouri). By letter dated March 11, 1966, the contracting officer

at DGSC approved the preproduction samples subject to correction of minor deficiencies unrelated to the detergent dispenser.

In addition to the submission of preproduction models, contract DSA–4–092381 also required plaintiff to submit technical manuals describing the component parts of the dishwashing machine. The manuals submitted on March 21, 1966, disclosed a detergent meter but did not show the machines equipped with an automatic detergent dispenser. The contracting officer reviewed and approved the manuals by letter dated April 14, 1966.

Following the January 31, 1966 contract, plaintiff was awarded eight additional contracts for 90 machines under specification 431b, as modified by Interim Amendment 1. One of the contracts (DSA–4–00823A dated March 4, 1966) called for the manufacture of 53 machines and required plaintiff to furnish short form provisioning lists pertaining to the major components of the dishwashing machine with the assigned part numbers. The lists prepared by plaintiff did not disclose an automatic detergent dispenser or a detergent meter. The short form provisioning lists were submitted to DGSC on April 27, 1966, and according to plaintiff's witness, the lists were reviewed and approved.

Prior to the performance of the 15 contracts in dispute, plaintiff was awarded 21 contracts (between April 14, 1966 and February 17, 1967), for a total of 290 single tank dishwashing machines under specification 431b, as modified by Amendment 2. One of these contracts (DSA–400–67–C–0492 dated August 3, 1966) called for the delivery of eight machines and required a preproduction model for first article testing. Mr. Kalen (who had succeeded Mr. Moore during the summer of 1966) inspected the preproduction sample on September 30, 1966. Although he had been approving machines without dispensers under previous contracts on the basis of Mr. Moore's practice, Mr. Kalen raised questions about the absence of the detergent dis-·

penser but did not mention or take exception to this fact in his first article test report. The contracting officer informed plaintiff by letter dated October 10, 1966, that the preproduction sample "is found to comply with the requirements of the contract."

Although there is considerable conflict in the testimony as to whether QARs Moore and Kalen made statements in agreement with plaintiff's interpretation of the specifications, we are of the opinion that a stipulation dated August 26, 1969, is dispositive of this point. The stipulation is signed by counsel of both parties. It is not manifestly contrary to other facts of record, and defendant never formally sought to be relieved from it. It reads in pertinent part:

> 5. That as to all contracts awarded to and performed by Appellant for single tank dishwashing machines under Federal Specification OO–D–431b and Amendments 1 and 2 (as listed on Appellant's Exhibit C), the Appellant and the respective QARs assigned to inspect said contracts were in agreement that the contracts did not require the machines to be fitted with automatic detergent dispensers.

The Board referred to the August 26, 1969, stipulation as "an after the fact recital of this course of dealing between the parties and adds nothing to appellant's case." Contrary to the Board's view, this court has stated that "[a] stipulation is a judicial admission binding on the parties making it absent special considerations." John McShain, Inc. v. United States, 375 F.2d 829, 831, 179 Ct.Cl. 632, 635 (1967). We do not find special considerations in this case and therefore hold the parties bound by the stipulation on issues of fact. Hegeman-Harris & Co. v. United States, 440 F.2d 1009, 1012, 194 Ct.Cl. 574, 581 (1971). Whether or not the QAR made a statement in agreement with the plaintiff's interpretation is an issue of fact—not of law—and may properly be the subject of a stipulation. In Hegeman-Harris we held that a stipulation as to the terms of certain subcontracts was overridden by the text of the subcontracts themselves, as in the record. There is nothing like that here. However, the correctness or legal effect of the QARs' interpretation, which is not the basic question here, is an issue of law and not binding on the court.

With regard to the issue of the lack of knowledge of the contracting officer that machines were not equipped with dispensers, the stipulation dated August 26, 1969, clearly states:

> 2. That at the time that the Government inspected and accepted deliveries under each of the contracts made the subject of the appeal in ASBCA No. 13865, the QAR was fully aware of the fact that the machines were not fitted with automatic detergent dispensers, and that the Appellant did not intend to furnish dispensers for the machines. Further, that other technical advisors to the PCO had such information available and had the opportunity and the duty to apprise the PCO that the machines were not fitted with automatic detergent dispensers.

The parties' stipulation concerning the availability of this information from the QARs and technical personnel—a question of fact—negates the Board's argument that the contracting officer's action can have no legal effect because he did not have actual notice that plaintiff's machines were not equipped with dispensers.

The Board further found, p. 38,691, that:

> 9. On each occasion appellant dissuaded the inspector from his position without disclosing to him the Government's failure to modify Paragraph 3.7.17 of the specification or the contracting officer's rejection of appellant's views in regard to the March and July 1965 procurements.

> 10. The actions of the inspectors were, therefore, not representative of the Government's own position but the results of appellant's persuasion, contrary to its actual knowledge of the

Government's view of the specification requirements.

In reply to these findings, plaintiff points out that the QARs were competent, qualified men specially trained to inspect and approve machines which comply with the requirements of the contract. In fact, Col. Richard C. Rubidge, Chief, DCASO, Kansas City, Missouri, testified that he would rate Messrs. Moore, Kalen and Pusateri in the top ten percentile of the QARs under his supervision. Although the QARs had specific instructions to bring deviations to the attention of the contracting officer, the Board stated in its opinion that the QARs had no explanation for their failure to note the absence of dispensers in their inspection reports. Moreover, the parties stipulated that the QARs were "fully aware of the fact that the machines were not fitted with automatic detergent dispensers, and that the Appellant did not intend to furnish dispensers for the machines."

■ As previously stated, the Board observed that "the actions of the inspectors are so plainly contrary to the clear requirements of the contracts that they cannot be deemed binding on the Government." Plaintiff concedes that the QARs had no authority to waive nonconforming supplies, but argues that the interpretations of the QARs further support the reasonableness of its own interpretation. It is undisputed that the QUARs were skilled men in the commodity area and were expressly assigned to Gresham's plant to inspect and approve machines. The inspectors may not have had authority to supply a binding interpretation of the contract, but their "actions constitute highly persuasive evidence of the reasonableness of plaintiff's interpretation." *See* Kraus v. United States, 366 F.2d 975, 981, 177 Ct.Cl. 108, 118 (1966).

Turning now to contracts in dispute, plaintiff was awarded nine contracts between May and December 1967 (the subject of ASBCA No. 13865) and six additional contracts between January and June 1968 (the subject of ASBCA No. 13812). Based upon its prior experience of approval of preproduction models, technical manuals and short form provisioning lists, plaintiff argues that it reasonably understood that the 15 contracts awarded under specification 431b, as modified by Amendment 2, similarly did not require dispensers.

In nearly all of the 15 contracts in dispute, the defendant waived the requirements in those contracts calling for first article testing, sample technical manuals and short form provisioning lists on plaintiff's certification that the machines, manuals and lists would be the same as those accepted and approved under previous contracts.

Contract DSA–400–68–C–2927, dated December 8, 1967, was the last of the series of nine contracts and required plaintiff to submit preproduction samples. On January 24, 1968, first article tests were performed at plaintiff's plant and Mr. Kalen signed the January 26, 1968, test report which stated that the "dishwashing machines conform to all specifications and requirements specified in this contract." The report was forwarded to DGSC and the contracting officer notified plaintiff by letter dated February 2, 1968: "The First Article is found to comply with the requirements of the Contract." Mr. Kalen testified that he again questioned plaintiff about the absence of the dispenser but did not mention in his report that the machines were not equipped with dispensers. All of the machines manufactured by plaintiff pursuant to the nine contracts were inspected and approved without dispensers by Mr. Kalen or his successor QAR (August J. Pusateri), who was assigned to plaintiff's plant after the above preproduction model had been approved by Mr. Kalen.

As previously stated, plaintiff successfully bid the six contracts without including the cost of automatic detergent dispensers and similar waivers of preproduction samples, manuals and lists were granted by defendant. Between April 15 and 19, 1968, Mr. C. R. Curtis, a Government auditor conducted a prod-

uct quality audit at Gresham's plant of contract DSA–400–68–C–2927 which was then in production. Mr. Curtis questioned plaintiff's authority to deliver machines without dispensers but took no definitive action at that time and plaintiff continued to manufacture machines without dispensers.

On April 30, 1968, plaintiff's president visited the contracting officer in Richmond to discuss plaintiff's interpretation of the dispenser requirement. The parties again met on May 27, 1968, to discuss this matter, but no conclusive results were reached.

Finally, on July 12, 1968, the contracting officer wrote plaintiff and directed that all machines to be delivered under the six contracts must be equipped with dispensers. Except for five machines which were urgently needed at Fort Riley, plaintiff installed dispensers on all the machines manufactured under the six contracts.

By letter dated August 14, 1968, plaintiff filed a claim for an equitable adjustment in the contract prices for the increased costs of furnishing these machines with dispensers. Plaintiff asserted that the contracting officer's "letter of July 12, 1968, constitutes a 'written order' within the contemplation of the 'Changes' article of each of the above-mentioned contracts, changing the contract requirements." This claim was denied by letter dated November 27, 1968; plaintiff's timely appeal to the Board was docketed ASBCA No. 13812.

By letters dated August 14, 1968, the contracting officer invoked the warranty provision in each of the previous nine contracts for plaintiff's failure to furnish supplies which conform to the specification requirements and elected the option of an equitable reduction in the contract prices. Plaintiff disclaimed any breach of warranty and refused to grant a reduction. Thereupon, the contracting officer wrote the plaintiff (on December 18, 1968), and assessed and demanded the sum of $39,800, which represented the total equitable price adjustment. This figure was computed on the basis of $100 per dispenser unit for 398 machines delivered under the nine contracts, without dispensers. The unit price per machine was approximately $1,000. Plaintiff also appealed this decision and the matter was docketed ASBCA No. 13865.

The Board found that plaintiff was not entitled to an equitable adjustment because a change did not occur when the contracting officer directed plaintiff to install dispensers on the machines made subject of ASBCA No. 13812; and with respect to ASBCA No. 13865, the Government properly invoked the warranty clause in each of the nine contracts. Accordingly, the Board "remanded to the parties for negotiation" the question of the amount of damages to which the Government is entitled for plaintiff's breach of warranty.

Following the Board's adverse decision, plaintiff filed the present suit in this court and now argues that the Board erred as a matter of law in its interpretation of the contracts in dispute and that its decision is based upon certain findings of fact that are not supported by substantial evidence. Therefore, it is asserted, the ultimate conclusion of the Board is not entitled to finality under the standards prescribed by sections 1 and 2 of the Wunderlich Act. Defendant disputes plaintiff's claims and alleges as an affirmative defense that the Board's decision is final and binding on the court and the parties under the "Disputes" clause of the subject contracts and the Wunderlich Act (41 U.S.C. § 321).

Commissioner Day took the position that whatever the situation at any earlier date, by the time of award of the first of the contracts in suit, May 11, 1967, specification OO–D–431b had become ambiguous with respect to the plaintiff, and therefore the contracts that incorporated the specification were ambiguous also. Plaintiff reasonably interpreted the specification as it did and by the rule of *contra proferentem*, its interpretation is entitled to prevail. Some of us have difficulty with this argument. We see no reasonable doubt that the specification

originally, and as amended, meant that the automatic detergent dispensers were required, and plaintiff so understood. A document that, when issued, is unambiguous, but becomes ambiguous by lapse of time, is somewhat of a legal curiosity. Here, we do not think anything that happened later justified plaintiff in having any doubt as to what the original meaning was. We think, however, that plaintiff was led by defendant's acts reasonably to believe that even though the specification had been written to require automatic detergent dispensers, enforcement of the requirement had been suspended and in effect, it was waived until further notice. Reasons for this belief include: non-response to plaintiff's intimation that the dispensers were not being exacted of other suppliers, in letter of July 7, 1965, handwritten notation "Rewrite" in letter of March 4, 1965, discussions with QARs, about the requirement, in relation to contracts using the specifications, prior to those in suit, and acceptance of non-conforming machines under such contracts, approval of technical manuals by contracting officer, though they showed the dispenser was not being supplied, absence of dispensers from lists of major components, submitted to the contracting officer, and approval of preproduction models without dispensers. It may be added, the absence of the dispenser was in no way a latent defect. If present, it stood out, large and conspicuous, on the outside of the machine. The fact that the Army did not want the dispensers and that the specification was imposed on it would have lent credence to the idea that somehow the requirement had been suspended.

As pointed out by this court in L. W. Foster Sportswear Co. v. United States, 405 F.2d 1285, 186 Ct.Cl. 499 (1969), specifications notwithstanding, an experienced contractor "has no right to make a useless thing and charge the customer for it." at 508, 405 F.2d at 1290. In the *Foster Sportswear* case a producer of jackets for the military was deemed to have been correct in following a practice established in prior contracts for such jacket when he deviated from the specifications. In the *Foster Sportswear* case the specifications were defective. In the case at hand we do not decide that the specifications were defective and do not support our holding on the same ground as *Foster Sportswear*. We mention that case to show that the plaintiff had valid reason to be wary in the instant situation, believing as it did, in apparent good faith, that the involved requirement was a great mistake.

■ There can be no doubt that a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead. In Harvey Radio Laboratories, Inc. v. United States, 115 F.Supp. 444, 126 Ct.Cl. 383 (1953), cert. denied, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954), the plaintiff had contracted to produce certain radar equipment for the Army Air Force. The contract had a clause which called for the contracting officer to make a formal demand for negotiations within thirty days of receipt of certain accounting information from the plaintiff. The contracting officer failed to make the requisite demand and the plaintiff cited that failure in contending that it did not have to participate in the negotiations.

The court agreed that the demand requirement was clearly part of the contract clause and was a condition precedent to negotiations which the defendant did not meet. However, the court took note of the fact that prior to the plaintiffs' refusal to negotiate the parties had in fact been negotiating for over nine months. In holding that the plaintiff could not now raise the contract requirement of formal demand as a condition precedent the court stated, 1152 Supp. at 449, at 391–392:

* * * When a party with knowledge or the means of knowledge of his rights and of the material facts does what amounts to a recognition of the

transaction as existing, or acts in a manner inconsistent with its repudiation, or permits the other party to deal with the subject matter under the belief that the transaction has been recognized, or abstains for a considerable length of time from impeaching it, so that the other is reasonably induced to supposed that it is recognized, there is acquiescence, and the transaction, though it be originally impeachable, becomes unimpeachable, [Cites omitted.]

Industrial Uranium Co. v. United States, 376 F.2d 868, 180 Ct.Cl. 50 (1967), involved a producer of uranium ore who was suing as the result of defendant's (AEC) refusal to guarantee payment for plaintiffs' ore as required under a policy described in AEC circular #5. The defendant alleged, in part, that the plaintiff did not fall within circular #5 because of the failure of its ore to meet a lime content requirement known as the 3 to 1 lime test. In dealing with this defense the court stated at 376 F. 2d at 874, 60–61;

> As for the 3 to 1 lime test, the evidence demonstrates that the Commission, from the inception of the program, regularly accepted and paid for ore which failed to meet that requirement; so far as this record shows, the A.E.C. never rejected ore from any producer on that ground, never required its rejection by the mills, and never indicated any intention to enforce the criterion. In our view, the plaintiff has affirmatively proved that the 3 to 1 test "was a dead letter from the outset" and was effectively waived by the Commission as a condition of Circular No. 5 eligibility. * * *

■■■■ We have held that in resolving an ambiguity in a contract, it is reasonable to look at the conduct of the parties. Williamsburg Drapery Co. v. United States, 369 F.2d 729, 177 Ct.Cl. 776 (1966). It is a proper technique of contract interpretation to give the language the meaning that would be derived by a reasonably intelligent person

standing in the parties' shoes and acquainted with the contemporaneous circumstances. Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 975, 169 Ct.Cl. 384, 388 (1965); Deloro Smelting & Refining Co. v. United States, 317 F. 2d 382, 161 Ct.Cl. 489 (1963). This is equally true whether defendant has originally written an ambiguity into a contract, or has administered an initially unambiguous contract in such a way as to give a reasonably intelligent and alert opposite party the impression that a contract requirement has been suspended or waived. In the latter case, the requirement cannot be suddenly revived to the prejudice of a party who has changed his position in reliance on the supposed suspension. In Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 181 Ct.Cl. 607 (1967), the plaintiff contractor interpreted certain specifications as setting it a more onerous task than the defendant's officials would have required. They stood by and watched plaintiff endeavor in vain to satisfy the standard it set itself. The specifications, as construed by plaintiff, were impossible of performance. We held in the alternative, either that the specification was ambiguous or else that the action of defendant's officers was unconscionable and would not serve to defeat plaintiff's interpretation, even if incorrect.

■■■■ The waiver of a contract provision requires a decision by a responsible officer assigned the function of overseeing the essentials of contract performance, not just any Federal employee or officer whose work happens to be connected with the contract. Deloro Smelting & Refining Co., *supra*. Such a waiver by one with such authority will estop the Government. Branch Banking & Trust Co. v. United States, 98 F.Supp. 757, 120 Ct.Cl. 72, cert. denied, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951). Assuming arguendo that the QAR representatives lacked the necessary authority, we think only one finding is possible: that the contracting officer knew or should have known of the situation, and

**556**

that the authority was in his hands. If he did not know, he ought to have known, and knowledge is imputed to him. Chernick v. United States, 372 F.2d 492, 178 Ct.Cl. 498 (1967); Chris Berg, Inc. v. United States, 404 F.2d 364, 186 Ct.Cl. 389 (1968); J. A. Jones Constr. Co. v. United States, 390 F.2d 886, 182 Ct.Cl. 615 (1968).

It is true, here we have many contracts, twenty-one not involved in the dispute, followed by fifteen which are. All are under the same specification, and under none, did plaintiff supply the automatic detergent dispensers, until required under the alleged change orders here involved, as to some. We think the reasonable belief, that the specification requirement was dead or at least suspended, arose during administration of the twenty-one, prior to the award of the earliest of the fifteen in dispute. The belief related to a Federal Specification, not promulgated by the Army, that was incorporated in all. If it was reasonably believed to be dead or suspended as to one, it was so as to all, and it is not necessary to speculate as to deliveries before the belief became reasonable. Any such were under contracts not here involved. The evidence is overwhelming and unrefuted, that the belief was reasonable, we think, at least as early as the inspection of the preproduction samples under DSA–4–092381, the discussion with Mr. Moore, his discussion with his superior, the approval of the samples, and the contracting officer's approval of the technical manual. The latest of these events was April 14, 1966. The earliest award of a contract in this case was May 11, 1967.

### CONCLUSION

Plaintiff's motion for summary judgment is granted and defendant's cross motion is denied. Further proceedings are stayed pursuant to Rule 167 for a period of ninety (90) days to afford the parties an opportunity to obtain an administrative resolution of the equitable adjustment in the contract prices to which plaintiff is entitled.