ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Watts Constructors, LLC ) ASBCA No. 61493
)
Under Contract No. W91238-14-C-0040 )

APPEARANCES FOR THE APPELLANT: Jason R. Thornton, Esq.
Jeffrey B. Baird, Esq.
Daniel P. Scholz, Esq.
Finch, Thornton & Baird, LLP
San Diego, CA

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
Engineer Chief Trial Attorney
A.L. Faustino, Esq.
Robert W. Scharf, Esq.
Engineer Trial Attorneys
U.S. Army Engineer District, Sacramento

OPINION BY ADMINISTRATIVE JUDGE PROUTY

Before us is a dispute about whether the terms of the above-captioned contract (the contract) for the construction of several buildings required appellant, Watts Constructors, LLC's (Watts), electrical subcontractor to run electrical power lines in the buildings through rigid conduit as opposed to using more economical integrated metal clad (MC) cable.[1] Watts's electrical subcontractor, Helix Electric, Inc. (Helix), saw what it wished to see when it reviewed the contract's plans and specifications and used MC cable extensively in the construction. This was visible to quality assurance inspectors from the contracting agency, the United States Army Corps of Engineers (the Corps), but not objected to by the Corps until relatively late in the game. As will be discussed at length below, standard contract interpretation supports the Corps' reading of its contract, requiring the exclusive use of conduit, not MC. Moreover, though it would have been far better for the quality assurance inspectors from the Corps to have recognized and halted Helix's divergence from the requirements of the contract, their inaction did not change the meaning of the contract and was insufficient to support a finding of waiver of contractual compliance by the government.

---

[1] The reader has likely seen MC cable in their experience: it's an electrical power conductor surrounded by flexible grey metal as a single assembly (tr. 20; *see also* R4, tab 61 (photo) and tr. 165-66 (describing photo)). It comes in spools (tr. 91).

FINDINGS OF FACT

I.  Contract And Subcontract Awards

In the mid-2000s, the United States Army decided to build a facility for satellite communications on Camp Roberts, California near the town of Paso Robles (tr. 131[2] (inception of project in 2006)).  The contract to accomplish this goal encompassed the construction of four buildings:  a satellite communications operations center (by far, the largest of the buildings); a command/administrative support center; a repair and utilities building; and a covered storage shed (R4, tab 2 at 1).  This contract, in the amount of $38,914,500, was awarded to Watts on September 3, 2014 (R4, tab 2 at 2).  Shortly thereafter, Watts executed a subcontract agreement with Helix to perform all of the electrical work on the project (R4, tab 52 at 14-35; tr. 17-19).

The contract contained the standard Changes clause, to be found in Federal Acquisition Regulation (FAR) Part 52.243-4 providing authority of the contracting officer to change the terms of the contract (R4, tab 2 at 15-16).

II.  The Contractual Requirements Relating To Wiring

The Corps has an institutional preference for utilizing rigid conduit to run electric power cable in buildings that it has constructed (tr. 150, 175).  This is because the Corps believes that conduit-installed power lines will last longer (tr. 175-76).  Helix personnel were well aware of this general desire (tr. 79), but held their own preference for power cabling, which was the use of flexible MC (tr. 22, 35, 81).  As we will explain in Section III, below, although MC shares some of its characteristics, MC is not conduit.

Despite their concerns that the Corps would not permit the use of MC, Helix personnel involved in planning the construction found portions of the contract's specifications that, they believed, permitted the use of MC cable throughout and which we note below (tr. 22-24).

Part 2 of the Interior Distribution System section of the Electrical portion of the contract's specifications[3] is titled "Products" and lists required specifications for several dozen identified electrical distribution products.  One of these products is MC, and the applicable subsection provides, in its entirety:

---

[2] The hearing for this matter was held on a single day, thus there is only a single transcript volume in the record.

[3] Unless stated otherwise, all references to contract sections in this opinion will be to the Interior Distribution System section of the Electrical section.

2.8.6 Metal-Clad Cable

UL 1569,[4] NFPA 70,[5] Type MC cable.

(R4, tab 4 at 1886 (footnotes not in original))

A government witness characterized this portion of the contract as "boilerplate" (tr. 150). Supporting this characterization, there are at least two other products listed in the Products category that were not applicable to the project: armored cable and flat conductor cable (tr. 177-78; R4, tab 4 at 1887 (Section 2.8.7, Armored Cable; Section 2.8.9, Flat Conductor Cable)).

The other location that MC is mentioned in the contract is in Part 3 of the specifications, labelled, "Execution." Section 3.1, "Installation," includes direction about how to install different items. MC is included in this section and the applicable subsection provides, in its entirety:

3.1.3.2 Metal Clad Cable

Install in accordance with NFPA 70. Type MC cable.

(R4, tab 4 at 1900)[6]

Neither party has pointed to any other reference to MC in the contract (*see* app. br.; app. reply br.; gov't br.), the government assertion that nothing in the contract drawings depicts anything other than electrical conduit (gov't br. at 2-3, citing R4 tab 6 at 474-575[7]) has never been fully rebutted by Watts (we discuss its one attempt to find MC in the drawings below), and we have reviewed the salient drawings[8], ourselves, and never found any depiction of MC for wiring.

---

[4] "UL" refers to the Underwriter's Laboratory (tr. 27).
[5] "NFPA" refers to the National Fire Protection Agency, and the NFPA cited here is a national electric code (tr. 27-28).
[6] By contrast, the specifications include approximately four pages governing means and methods of conduit installation in the subsections under subsection 3.1.4 (*see* R4, tab 4 at 1900-03).
[7] The documents at tab 6 only go up to page 575, but the drawings referenced are within that smaller set.
[8] Namely, drawings E-102, E-103, E-104, E-105, E-106, E-108, E-109, E-110, E-111, E-112, E-120, E-121, E-130, and E-131, which all may be found in tab 6 of the Rule 4 file, ranging from pages to 492-510.

3

Instead, the drawings accompanying the specifications refer only to conduit. The drawings included a legend for "Circuiting." This legend referenced "wiring," though not MC. One legend depiction shows a horizontal line with three angled lines crossing it. Next to this are the words:

> CROSSLINES INDICATE NUMBER OF #12
> CONDUCTORS EXCEPT NEUTRAL CONDUCTOR FOR
> MULTIWIRE BRANCH CIRCUIT SHALL BE #10
> CONDUCTOR. EQUIPMENT GROUNDING
> CONDUCTOR IS NOT SHOWN. NO CROSSLINES
> INDICATES 2 - #12, ½" CONDUIT; OTHER
> CONDUCTOR AND CONDUIT SIZES AS INDICATED.

(R4, tab 6 at 474)

When examined about the meaning of these words by government counsel, Helix's project manager, Mr. Shane Doner, agreed that this legend applied to all electrical lines to be installed under the contract (tr. 65-68). He further conceded that nothing in the drawings explicitly indicated the use of MC (tr. 65) and generally agreed that the drawings required the use of conduit (tr. 65, 67-68).

Watts argues that a portion of the drawings, nevertheless, allows for MC. Drawing Sheet E-103 (R4, tab 6 at 493) depicts a solid line connecting several power outlets which, in accordance with the legend discussed above, was generic "conduit," thus (as Watts would have it) permitting MC (app. reply br. at 5-6).[9] We will address this more below.

The government witnesses involved in the project believed that two provisions of the contract precluded the use of MC. The first, was the drawings cited above. The second, included in Part 3 of the specifications, "Execution," provided in relevant part:

3.1.3 Wiring Methods

> Provide insulated conductors installed in rigid steel
> conduit, IMC [a type of conduit[10]], rigid nonmetallic conduit,

---

[9] This argument would have been better made in Watts's opening brief, rather than in its reply. Nevertheless, the government did not object and we may resolve it without the government's input.

[10] See tr. 148, referring to IMC as conduit.

4

or EMT [another type of conduit[11]], except where specifically indicated or specified otherwise or required by NFPA 70 to be installed otherwise.

(R4, tab 4 at 1899-1900)

With respect to the salient contract terms, we note that the contract incorporated a standard clause regarding the relative use of the drawings and specifications that provided, in relevant part, that, "[i]n case of difference between drawings and specifications, the specifications shall govern." (R4, tab 2 at 7 (incorporating by reference FAR 52.236-21 (FEB 1997) ALT I)).

III.  MC Is Not Conduit As Defined In The Contract

During the hearing and the post-trial briefing, Watts made an attempt to allege that MC was a type of conduit, and thus permissible in the contract where it demands conduit (*see* app. br. at 9-10; app. reply br. at 6).  As a matter of fact finding, we do not find this allegation persuasive and find that MC is *not* conduit as referenced in the contract.  The allegation that MC is a type of conduit came from the testimony of Mr. Doner, the Helix project manager, who testified that he considered conduit to be a "generic" term and that he thought MC to be a type of conduit since the metal effectively protected the conductor (tr. 42-44).  He did not go so far, however, to call "conduit" a term of art, and testified that he'd never heard MC embraced as "conduit" by other members of the trade (tr. 45).  Mr. Doner's testimony, then, was little more than an individual's personal opinion.

Despite sharing some characteristics with conduit, MC is *not* considered conduit by the contract.  First, the conduit described in Section 3.1.3, Wiring Methods (the portion of the contract that required use of conduit unless specified otherwise), was referred to as "rigid" (*see* R4, tab 4 at 1899-1900; *see also* tr. 118-19 (referring to rigid conduit)).  MC's great virtue is that it is flexible (*see* tr. 91 (MC comes in spools)).  Moreover, organizationally, the contract separated conduit from MC (*see* R4, tab 4 at 1885-86 in which MC is included under subset of "WIRES AND CABLES," Section 2.8 of the specifications, while "CONDUIT AND FITTINGS" is in Section 2.2 of the specifications, at R4, tab 4 at 1882).  Mr. Doner admitted as much when he conceded that MC was not included in the conduit described in Section 3.1.3 of the specifications (tr. 58-59).  And, with the exception of Mr. Doner's testimony that he considered MC to be functionally conduit, other portions of his testimony casually referred to conduit and MC as different things (*e.g.*, tr. 33-34).  Mr. Woodruff, Helix's

---

[11] *See e.g.,* tr. 22-23, referring to EMT, electro-metallic tubing, as conduit and distinct from MC (*see also* tr. 56, indicating EMT was used to replace MC when the Corps demanded the use of rigid conduit).

5

superintendent for the project, also referred to "running conduit" in his testimony as something separate and distinct from installing MC (tr. 119-20).

## IV. What Helix Did

Helix, of course, installed much of the wiring as MC, with a significant amount of conduit in certain places. Its rough estimate is that, for the first three buildings it worked on, and largely completed, before the Corps directed it to stop, the portion of conduit to MC was 60/40. (Tr. 34, 101-02) There is no dispute that there was extensive use of MC in the buildings as reflected in multiple photographs admitted into evidence (*see* R4, tabs 61, 66, 72).

## V. What The Corps Did (And Didn't Do)

Watts presented testimony purporting to support a finding that the use of MC was raised with the Corps during the first meeting they had with Helix before the installation began (*see* app. br. at 7, citing tr. 86, 91-92). Although Mr. Woodruff testified that the use of MC came up at that meeting (which occurred on April 28, 2016 (tr. 87-88)), he did not appear to specifically recall it. Rather, the gist of his testimony was that since it was in the specification and the specification would be read at the meeting, it would have been noted, "[b]ut there was no depth to a conversation on MC cable." (Tr. 86) The notes of the meeting, which were taken by a Watts employee, Doug Saunders (*see* tr. 90), do not mention MC anywhere. They do, however, reference EMT (previously noted to be a type of conduit) and "rigid (threaded)" conduit. (R4, tab 82; *see also* tr. 118) Thus, we find the evidence that the use of MC was discussed and agreed to at this meeting to be weak. Whatever happened, it certainly was not deeply discussed or analyzed by either party and we find it unlikely that there was any consideration of what the contract terms required or what contract requirements the Corps might waive.

In any event, Corps personnel on site did not prevent Watts from installing MC during most of the preliminary construction of the project. In fact, on several occasions, the Corps inspected wiring installation inside walls prior to the "closing" of the walls by the installation of drywall and made no objection to the use of MC (*e.g.*, tr. 96-99). It is important to note, however, that the quality assurance person on site for the Corps was not primarily performing a quality assurance function for electrical work, but was focused on other disciplines (tr. 134-35). Watts provided testimony from Mr. Woodruff that Mr. John DeVito, one of the Corps quality assurance representatives, had stated (after the Corps required the removal of the MC) that he read the specifications as allowing the use of MC (tr. 105-06).

On March 9, 2017, the Corps Quality Assurance Electrical Engineer for the project, Ms. May Okuhara, inspected the work already performed and determined that Watts had not complied with the contract due to its use of MC, rather than conduit

6

(tr. 171-72; R4, tab 34).  The lower level quality assurance persons on site for the Corps had never been made aware that Watts's use of MC was in any way contra-indicated by the plans and specifications before then (tr. 193-94).  There is no evidence in the record that the contracting officer or any other government employee with authority to change the contract's requirements were aware of Watts's use of MC in lieu of conduit throughout the project.

After Ms. Okuhara made her objections to the use of MC known, the Corps directed Watts to remove the MC and replace it with conduit (R4, tab 29).  Watts complied, which entailed the substantial expense of ripping out walls already emplaced in order to install the conduit and then replacing the walls (tr. 102-03).  MC was permitted by the Corps for use as a "fixture whip," which is used to connect lighting fixtures to their power sources (tr. 103).

On August 22, 2017, Watts submitted a certified claim to the contracting officer, passing through the claim it received from Helix, seeking $415,120 for requiring it to use MC (R4, tab 52).  The contracting officer denied this claim in a final decision dated October 20, 2017 (R4, tab 53).  This timely appeal followed.

DISCUSSION

Notwithstanding the contract's two mentions of MC, the contract required the use of specified rigid conduit, not MC.  Moreover, the contract terms requiring the use of conduit were unambiguous.  Though the Corps' failure to object to Watts's use of MC is disappointing, it did not change the contract's requirements or otherwise entitle Watts to relief.  Thus, we deny the appeal.

I.  The Contract Required The Use Of Conduit, Not MC

The government's position on the contract is straightforward:  Section 3.1.3 of the specifications required the use of specified conduit unless otherwise noted, and nothing in the contract noted otherwise.  Accordingly, the use of MC was prohibited.  (*See* gov't br. at 8).  Watts, on the other hand, argues that the contract's citation to MC in two places means that it is permitted (app. br. at 5).  Watts also argues that MC *is* conduit, and thus allowed by the drawings (*id* at 5-6; app. reply br. at 5-6).  The government is correct.

To resolve the meaning of the contract, we begin with the law of contract interpretation.  Under basic principles of the law, a contract is interpreted "in terms of the parties' intent, as revealed by language and circumstance." *United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) (citations omitted).  Generally, this process begins and ends with the language of the contract. *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006).  And in reviewing this language, the Board should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to

all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922 (citations omitted); *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract"); *Hunkin Conkey Constr. Co. v. United States*, 461 F.2d 1270 (Ct. Cl. 1972) (rejecting contract interpretation that would render a clause in the contract meaningless).

To Watts, the existence of language describing MC in the contract means that it must be permitted because otherwise, the language would be superfluous, which is disfavored by law (app. br. at 5-7). It is true that the law disfavors superfluous language, but it is also true that we are interpreting a particular contract that plainly contains unnecessary "boilerplate" beyond just its reference to MC. As noted above, in addition to referring to MC, the contract also, indisputably, contains descriptions of armored cable and flat conductor cable which were not required or ever used in the construction. Thus, an understanding of the contract as written must reckon with the fact that its drafters included some unnecessary "boilerplate" describing types of cabling not used.[12] We add that the language describing MC never said that it should be used in particular cases, just that if it were used, it should be done in a certain way (*see* tr. 73 (interpretation by Mr. Doner)).

Against this rather weak argument, the plainly proscriptive language in Section 3.1.3 leaves no room for doubt that only rigid conduit may be used for power. To be sure, the Section did provide the "out" that non-enumerated wiring, could be used "where specifically indicated or specified otherwise or required by NFPA 70 to be installed otherwise..." but Watts (through Mr. Doner's testimony referenced above) has conceded that nowhere in the specifications and drawings is there any *specific* indication of MC, and Watts has not alleged that the NFPA required the installation of MC instead of conduit.

Watts appears to argue that the reference to "conduit" in the legend of the drawings combined with Mr. Doner's assertion that "conduit," as a generic term embracing MC means that the drawings would permit MC, thereby allowing it to escape the strictures of Section 3.1.3 (app. br. at 6). As stated earlier, we have made the factual determination that "conduit" in the contract does not include MC. Moreover, for the reference to "conduit" in the drawing legend to overcome Section 3.1.3's requirement for four specified types of conduit, it would have to "specifically indicat[e]" as much. Even if we agreed that "conduit" was meant to be a generic term embracing MC (and we emphatically do not), we would find that use of a generic term in the drawing legend is

---

[12] The government does not make the argument, but the allowance of MC on the "whips" for lighting fixtures could conceivably make the references to MC in the contract less superfluous. We need not, however, draw that conclusion to get to the same result.

not the kind of specific indication required for use of anything but the specified conduit in Section 3.1.3. Thus, in accordance with Section 3.1.3 of the contract, the Corps was right to require the use of conduit over MC.

II. The Corps' Failure To Stop Watts From Using MC Provides No Basis For Granting Watts Relief

In terms of equity, the failure of Corps inspectors to halt the use of MC early in the contract, before the closure of walls and near completion of wiring work, is troubling, to say the least. Nevertheless, in terms of equity, it was also Watts's responsibility to comply with the terms of the contract. Moreover, absent affirmative misconduct (not alleged or proved here) the government's failure to enforce the terms of a contract is not a matter of estoppel. *Tech. Sys., Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,387 ("*TSI*"). Recognizing the implications of *TSI*, Watts has limited its argument of the import of the Corps' conduct to a reflection of how the Corps interpreted the contract (tr. 7-8; app. br. at 7).

A. Government Inspectors' Apparent Acquiescence To The Use Of MC Does Not Change The Meaning Of The Contract

Watts argues that the government's acquiescence to its use of MC and its inspectors' beliefs that MC was permitted provide evidence that the Corps interpreted the contract the same way that it did, which may be considered by the Board when interpreting the provisions at issue here (*see* app. reply br. at 6-7, citing *Gresham & Co., Inc. v. United States*, 200 Ct. Cl. 97, 114 (Ct. Cl. 1972) (citing *Kraus v. United States*, 366 F.2d 975, 981 (Ct. Cl. 1966)). We agree that the contemporaneous interpretation of a contract prior to a dispute is entitled to some consideration. *See Aegis Def. Services, LLC*, ASBCA Nos. 59082, *et al.*, 17-1 BCA ¶ 36,915 at 179,856, citing *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982) (contemporaneous construction of an agreement prior to dispute is entitled to great weight). Nevertheless, under the circumstances presented here, we find this argument to be unpersuasive.

Primarily, we reject Watts's argument because we do not find the contract to be ambiguous. Accordingly, we need not go beyond the language of the contract to divine its meaning. *TEG-Paradigm*, 465 F.3d at 1338. Even if we were inclined to go beyond the contract language here, however, we would not find the government inspectors' inaction or their opinions on the meaning of the contract to be particularly helpful. We may only speculate to what degree any government quality assurance personnel compared the requirements of the specifications to Watts's use of MC, and the hearsay statement that Mr. DeVito thought the contract permitted the use of MC is of little evidentiary value: why did he think it was permitted? And was this reason based upon knowledge of the government's expectations or simply buying into the same oversight as Helix personnel? Since we do not know the answers to these questions, his opinion has

9

little persuasive weight in terms of divining the intent of the contract drafters, even if held by one person who worked for the government. Obviously, Ms. Okuhara, who also worked for the government but was in a more senior position, held a different opinion.

### B. The Government Did Not Waive Compliance With The Contract's Terms

In its reply brief, primarily in a footnote, Watts also makes the argument that the government waived compliance with the terms of the contract (app. reply br. at 7 n.2). Were we so inclined, we could reject this argument as being brought too late; moreover, we are familiar with (and agree with) decisions in other courts that consider arguments raised only in footnotes to be waived. *E.g., United States v. Centeno*, 793 F.3d 378, 388 n.9 (3d Cir. 2015). In any event, we disagree with Watts on the substance of this argument.

There is a line of cases which provides that the government may waive strict compliance with contractual requirements and be precluded from later re-imposing those requirements upon the contractor. *See, e.g.*, *Gresham & Co. v. United States*, 470 F.2d 542, 554 (Ct. Cl. 1972) ("There can be no doubt that a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead"); *Worldwide Parts, Inc.*, ASBCA No. 38896, 91-2 BCA ¶ 23,717 at 118,712; *Walsky Constr. Co.*, ASBCA No. 36940, 90-2 BCA ¶ 22,934 at 115,125; *see also Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 687-88 (1994). Notably, though, these cases require knowing failure to exact performance – presumably by one with authority to waive contractual terms. As the government points out, there is a long line of cases in which we have found that erroneous approval of contractors' work by government inspectors does not, by itself, constitute waiver by the government. *See Atterton Painting & Constr., Inc.*, ASBCA No. 31471, 88-1 BCA ¶ 20,478 at 103,586-87 (citing and quoting cases). Here, there is no evidence that any government personnel knowingly waived the contractual terms inasmuch as the quality assurance representatives on site who observed the use of MC appear to have been of the opinion that it was not precluded by the contract. Moreover, as a matter of authority, under the Changes Clause, only the contracting officer is noted as having the authority to alter the terms of the contract on behalf of the government. Whether such authority may be delegated to such persons as quality assurance representatives, there is no evidence that they possessed such authority or that the contracting officer was made aware of any waiver of contract terms by them. Watts has proved no knowing waiver of adherence to contract terms by anybody who could do so on behalf of the government.

<u>CONCLUSION</u>

The direct terms of the contract plainly required the use of conduit, which does not include MC, and the government never waived compliance with the contract's terms. The appeal is denied.

Dated: March 19, 2020

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>                                        I <u>concur</u>

RICHARD SHACKLEFORD                   ALEXANDER YOUNGER
Administrative Judge                            Administrative Judge
Acting Chairman                                  Armed Services Board
Armed Services Board                          of Contract Appeals
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61493, Appeal of Watts Constructors, LLC, rendered in conformance with the Board's Charter.

Dated: March 31, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals