Walter J. SAMPSON et al., Plaintiffs, and the Equitable Life Assurance Society of the United States, Plaintiff-Intervenor,

v.

The UNITED STATES.

No. 379–68.

United States Court of Claims.

Jan. 28, 1976.

John B. Carroll, Syracuse, N.Y., attorney of record for plaintiffs. Carroll, Carroll & Butz, Syracuse, N.Y., of counsel.

Hershel Shanks, Washington, D.C., attorney of record for plaintiff-intervenor. Glassie, Pewett, Beebe & Shanks and James Bruce Davis, Washington, D.C., of counsel.

Herbert Pittle, Washington, D.C., with whom was Asst. Atty. Gen. Wallace H. Johnson, Washington, D.C., for defendant.

Before DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

SKELTON, Judge.

This case involves the claim of Walter J. Sampson, Bernard Greenbaum, Abner J. Mesirow, and Arthur A. Bogeaus, Copartners, doing business under the name of Southeastern Industrial Development District (SID or plaintiff), as former owners of the Chimes Office Building in Syracuse, New York, to an award of $292,574.26 assessed against the United States, a former lessee of the building, as restoration damages upon the termination of the lease, as recommended by Trial Judge Spector and approved by an order of the court of June 28, 1974, in 204 Ct.Cl. 920, from which no appeal was taken. The Equitable Life Assurance Society of the United States (Equitable) intervened in the suit before trial claiming that it is entitled to the award as mortgagee of the building in accordance with the terms of its mortgage and the

assignment contained therein, so that the proceeds of the award can be applied on its unpaid mortgage indebtedness. SID moved to dismiss the intervention by Equitable. A decision on the motion was postponed until the merits had been decided, and we are now required to decide whether to allow the motion to dismiss Equitable's intervention, and if denied, to decide who is entitled to the award. Both parties moved for summary judgment and oral argument was heard by a panel of the court, after which judgment was entered granting plaintiff's motion for summary judgment, denying that of Equitable and dismissing Equitable's petition in intervention. See slip opinion of May 14, 1975.

Following the above opinion, Equitable moved for a rehearing en banc which was granted, although SID opposed the motion. Additional briefs were filed and oral argument was heard by the en banc court. We reverse the decision of the panel and hold that Equitable is allowed to intervene and that as mortgagee and assignee it is entitled to the $292,574.26 award to be applied on its unpaid mortgage debt.

It appears that it will be necessary to again describe the basic facts upon which this controversy is based. The Chimes Building was built by the Hubb City Realty Corporation in 1928 at a reported cost of $1,420,000. That corporation executed a bond in the sum of $1,200,000 and a mortgage on the property to Metropolitan Life Insurance Company, recorded August 31, 1929, in Liber 750 of Mortgages, page 641, County Clerk's Office, Onondaga County, New York. Another bond in the sum of $600,000 and mortgage was given on the building by James E. and Blanche O. Hefferman to the Syracuse Trust Company on March 20, 1928, which was recorded the same day in Liber 725 of Mortgages, page 129 of said county. In due time, Equitable acquired these bonds and mortgages and combined and consolidated them with later mortgages, as will be described below.

On July 5, 1946, the Onondaga Holding Corporation acquired the Chimes Building subject to the above mortgages. On December 3, 1946, the United States leased the building from the corporation for $250,000 per year for five years with three five-year renewal options.

After leasing the building to the Government, the Onondaga Holding Corporation desired to consolidate the 1928 and 1929 mortgages, and such prior mortgages were combined and consolidated with the new mortgage, dated December 26, 1947. This consolidation was advantageous to Onondaga because the debts were consolidated into one debt and the dates and amounts of payments were made more flexible. This 1947 mortgage is recorded in Book 1310, page 663, of Mortgages, Onondaga County, New York. It is important, because for the first time an assignment of awards was made to Equitable. This assignment appears in Clause 20 as follows:

20. That any and all awards heretofore and hereafter made to the present and all subsequent owners of the mortgaged premises by any governmental or other lawful authorities for taking by eminent domain the whole or any part of said premises or any easement therein, including any awards for any changes of grade of streets, are hereby assigned to the holder of said mortgage who is hereby authorized to collect and receive the proceeds of any such awards from such authorities and to give proper receipts and acquittances therefor, and to apply the same toward the payment of the amount owing on account of said bond and mortgage, notwithstanding the fact that the amount owing thereon may not then be due and payable; and the said party of the second part convenants and agrees, upon request, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning the aforesaid awards to the holder of said mortgage, free, clear and discharged of any and all encumbrances of any kind or nature whatsoever.

It will be noted that the assignment of awards in Clause 20 in this 1947 mortgage is limited to awards by the Government *"for taking by eminent domain the whole or any part of said premises * * *."* [Emphasis supplied.] It is important to note that this limitation of awards to those for Government taking by eminent domain was omitted and does not appear in later (1954) mortgages executed by SID to Equitable, where the assignment covers *all awards* made by *anyone.* As will be shown below, neither the Government nor takings by eminent domain are even mentioned in the assignments in the 1954 mortgages executed by SID and upon which the parties base their claims in this case.

On February 29, 1952, over four years after Onondaga executed the 1947 mortgage to Equitable, SID acquired the Chimes Building for $3,000,000. At that time SID needed additional funds and to take care of this need it borrowed $284,-625 from Equitable and in connection therewith executed a bond and mortgage dated April 1, 1954, recorded in Book 1642, page 221, of Mortgages, Onondaga County, New York. This mortgage contains an assignment of *all awards* made or to be made to the present and all subsequent owners of the building to Equitable as security for the payment of the bond. This assignment, as pointed out above, was a revision and a rewriting of what appeared in Clause 20 of the 1947 mortgage quoted above. The revised Clause 20 (although it is not so numbered in this 1954 mortgage) provides as follows:

> Together also with any and all awards heretofore made and hereafter to be made to the present and all subsequent owners of said premises, including any award and awards for change of grade of any street affecting said premises, which said award and awards are hereby assigned to the mortgagee, who is hereby authorized and empowered to collect and receive such award and awards and to give proper receipts and acquittances therefor, and to appy [sic] the same toward

the payment of the amount owing on this mortgage, notwithstanding the fact that the amount owing on this mortgage may not then be due and payable; and the mortgagor for himself, his heirs and all subsequent owners of said premises, hereby covenants and agrees with the mortgagee and the successors and assigns of the mortgagee, upon request by the holder of this mortgage to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning said award and awards to the holder of this mortgage, free, clear and discharged of any encumbrances of any kind or nature whatsoever.

On the same day, April 1, 1954, SID executed a new bond and mortgage in favor of Equitable in which it was recited that Equitable was the owner and holder of the bonds and mortgages of 1928, 1929, and 1947 described above, together with SID's bond and mortgage of April 1, 1954, in the sum of $284,625, and on all of which there was owing to Equitable $1,650,000, all of which bonds and mortgages were combined and consolidated and spread over the property. This consolidated mortgage of April 1, 1954, is recorded in Book 1643, page 631, of Mortgages, Onondaga County, New York. It is important to note that this consolidated mortgage of April 1, 1954, recites that the premises are leased to the United States under a lease with Onondaga Corp. dated December 3, 1946, recorded in Liber 1311, page 249, Conveyances of Onondaga County, New York. The facts show that the Government had occupied the building since about December 3, 1946, and that it had made many alterations and changes in the building, such as removal of corridors, walls and partitions, lights, changes to terrazzo floors, elevator doors, marble and wood fixtures. The Government was obligated by the terms of its lease to restore the leased premises at the end of the lease to the condition they were in when the lease began, reasonable wear and tear and damages by the elements,

excepted. It was obvious to any reasonable person that when the Government vacated the premises, it would have to either restore the premises at its own cost and expense or make a monetary award in lieu thereof.

Under these circumstances, SID executed the April 1, 1954, consolidated mortgage mentioned above in which it assigned to Equitable "*all awards* heretofore made or hereafter made to the present and all subsequent owners of the mortgaged premises as security for the mortgage debt." This assignment is contained in Clause 20 of the April 1, 1954, Consolidated Mortgage as follows:

20. The party of the second part for themselves, their heirs, legal representatives, successors and assigns, does hereby assign to said party of the first part, its heirs, legal representatives, successors and assigns any and all awards heretofore made and hereafter to be made to the present and all subsequent owners of the mortgaged premises, including any award and awards for change of grade of any street affecting said mortgaged premises, and said party of the first part, its heirs, legal representatives, successors and assigns is hereby authorized and empowered to collect and receive such award and awards and to give proper receipts and acquittances therefor, and to apply the same toward the payment of the amount owing on said bond and mortgage, notwithstanding the fact that the amount owing on said bond and mortgage may not then be due and payable, and said party of the second part for themselves, their heirs, legal representatives, successors and assigns hereby covenants and agrees with said party of the first part, its heirs, legal representatives, successors and assigns upon request to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning said award and awards to the holder of said bond and mortgage, free, clear and discharged of any incumbrances of any kind or nature whatsoever.

It will be noted that this assignment is all inclusive and assigns "*all awards*" by anyone whomsoever, and that SID "covenants and agrees with the mortgagee [Equitable] to make, execute, and deliver any and all assignments and other instruments sufficient for the purpose of assigning said award and awards to the holder of said bond and mortgage, free, clear, and discharged of any incumbrances of any kind or nature whatsoever."

It would be difficult indeed to write an assignment more all inclusive, more comprehensive, and more unambiguous than the assignment of all awards made by SID to Equitable in the 1954 consolidated mortgage as security for Equitable's unpaid mortgage debt.

■ The plaintiff (SID) ratified and confirmed the Consolidated Mortgage of 1954, which is presently in force, on September 1, 1966, when it signed an extension agreement with Equitable extending the time of payment of the mortgage debt. The extension agreement provided:

* * * Nothing herein contained shall invalidate any of the security now held for said indebtedness or impair any of the conditions of the Bond and Mortgage except as herein specifically provided.

The extension agreement did not change the assignment of *all awards* in the mortgage. The foregoing provision had the effect of ratifying and confirming the assignment provisions in the mortgage.

Thus, we see that SID assigned all awards to Equitable twice in 1954 in the two mortgages it signed that year, and in 1966 ratified and confirmed the assignment provisions in the 1954 consolidated mortgage by the extension agreement.

■ SID claims in the instant suit that the assignment is limited to awards for eminent domain takings by the Government. There is no such limitation in the assignment in the 1954 consolidated mortgage. The 1947 mortgage did have such a limitation, but it was exe-

cuted more than four years before SID owned the property and SID had nothing to do with that mortgage. Furthermore, the 1947 mortgage was replaced, combined, and consolidated by the 1954 mortgage signed by SID. It would appear that SID is trying to apply and enforce the limitation in the 1947 mortgage, which is no longer in force with regard to its claim here. This it cannot do. We hold that Clause 20 in the 1954 consolidated mortgage assigned *all awards* made by anyone past, present, and future, with respect to the mortgaged property, to Equitable as mortgagee as security for its mortgage debt, and that the assignment included the restoration award of $292,574.26 involved in the present suit. Equitable is entitled to recover such award so that it can be applied on the unpaid mortgage debt.

 SID challenges Equitable's right to the award for other reasons which we will now consider.

The record shows that there was a second mortgage on the property to Irving Trust Company which was in default in 1966. City Investing Company (CIC) became the assignee of Irving Trust Company and commenced foreclosure proceedings against SID in a district court. In October 1967, CIC accepted a deed to the property from SID, which of course was subject to Equitable's first mortgage, in lieu of foreclosure. CIC and SID agreed *between themselves* at the time that CIC would receive any compensation award for rent as a result of a condemnation suit filed by the United States to acquire the use of a part of the Chimes Building it had previously leased, for a further period ending November 30, 1967. *See United States v. Certain Space, Syracuse, New York*, 320 F.Supp. 491 (N.D.N.Y.1969), *aff'd*, 435 F.2d 872 (2d Cir. 1970), *cert. denied*, 402 U.S. 908, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971). CIC and SID further agreed *between themselves* that any restoration award for damages to the building (as distinguished from a claim for rent) was reserved to SID. Equitable was not a party to this agreement and knew noth-

ing about it until it received a letter from SID dated May 6, 1968, in which was enclosed a letter from CIC to SID dated September 14, 1967, describing the agreement. In its letter of May 6, 1968, SID asked Equitable to accede to the agreement between CIC and SID. Equitable refused, as shown by its letter of May 14, 1968, stating:

As you may know, Equitable's mortgage on the captioned premises has not yet been paid off and, accordingly, Equitable does not wish at the present time to waive any rights which it may have under such mortgage.

It should be pointed out that as early as March 2, 1967, SID asked Equitable in a letter of that date to waive its rights to any restoration claim against the Government. Equitable refused in a letter to SID dated March 9, 1967, saying:

In your letter of March 2 you have requested that the Equitable waive any claim to damages accruing during the term of the lease. I am not sure just what this term means. If it has reference to damage to the building which would incur costs for repairs or refinishing because of the government use, it would seem that the Equitable would be entitled to such reimbursement so that the building could be brought back as near as possible to its condition prior to the beginning date of the lease, reasonable wear and tear accepted [sic]. * * *

On May 20, 1968, SID again wrote to Equitable asking it to waive its rights under the mortgage and Equitable again refused in a letter to SID dated May 22, 1968.

The foregoing correspondence has been considered in detail because SID now claims that Equitable has waived its rights to the restoration award by not objecting to the agreement between CIC and SID. This argument is unpersuasive. Equitable was not a party to the agreement and did not even know about it until long after it had been made. The agreement is not binding on Equitable and it did not waive any rights it had under the mortgage by not objecting

to something it did not know about. Furthermore, the foregoing correspondence between it and SID shows without question there was no waiver by Equitable.

■ SID also contends that Equitable waived its right to the restoration award by events that occurred at the trial of *United States v. Certain Space, supra.* We find this argument without merit. The facts in that case show that at the trial SID asserted three claims; namely, (1) a claim for rent for the space condemned; (2) the restoration of the premises claim; and (3) a "loss of equity" claim. During the proceedings, the court stated that the restoration claim could not be asserted in the condemnation case but would have to be pursued in the United States Court of Claims. The court further found that SID had no "loss of equity" claim. This left only the rent claim. Although Equitable could have asserted its right to the rent award under Clause 20 of its mortgage, it generously did not do so and waived its right to the rent claim. Equitable took the position that the condemnation award for the use of the building was the same as rent and that since its mortgage was not in default, it would not claim the award for rent.

SID contends that when Equitable waived its rent claim in the above case, it also waived its right to the restoration award. The court in that case rejected this argument of SID by saying:

> * * * [D]efendant Equitable has waived its right to lay claim to any part of the just compensation. However, if SID has some *residual rights* [*i. e.,* the "loss of equity" claim and the restoration claim] left under the assignment, [from SID to CIC] Equitable, in that case, asserts that it becomes entitled to them under the condemnation clause found in its first mortgage. [Emphasis supplied.] [320 F.Supp. at 496.]

Again the court recognized that there was no waiver of the restoration claim by Equitable and that in fact it belonged to Equitable. The court said:

> Even if SID had some residual rights left under the assignment, Equitable, as noted earlier, asserts that it becomes entitled to them under the condemnation clause in its first mortgage. *This stands as a further bar to SID's claim.* [Footnote omitted.] [Emphasis supplied.] [320 F.Supp. at 497.]

The court referred to footnote 7 in its holding last above quoted, in which footnote Clause 20 of the 1954 consolidated mortgage is set forth in full. [320 F.Supp. at 497.]

We hold that Equitable did not waive its right under Clause 20 of the mortgage to the restoration award when it waived its right to the rent claim.

■ SID argues that Equitable is estopped to claim the restoration award because on July 30, 1968, an extension agreement was executed between Salina Onondaga Company, a New York limited partnership, the then-owners of the building and Equitable wherein it was recited:

> WHEREAS, * * * there are no offsets, set-offs, defenses or counterclaims *against said Mortgage notes and mortgages* and the monies due thereunder *and that said mortgages,* as consolidated and spread, *are a first and valid lien upon the premises described therein;* * * * [Emphasis supplied.]

SID invokes the principle of estoppel by deed, citing *Van Winkle v. Van Winkle,* 95 App.Div. 605, 89 N.Y.S. 26 (1904), *aff'd,* 184 N.Y. 193, 77 N.E. 33 (1906). SID argues that the above quoted clause estops Equitable from claiming the restoration award in question. We do not agree, and find the argument without merit. The clause nowhere contains a statement directly or indirectly that Equitable has no claim to the award. We agree with the principles set forth in the *Van Winkle* case. It merely held that " * * * a recital in a deed of a material fact is binding and conclusive *upon the parties, and those claiming under them* as privies in blood, in estate or in law." [Emphasis supplied.] [89 N.Y.S.

at 28.] SID is neither a party, heir, assignee, nor successor to the extension agreement of July 30, 1968, and was not misled thereby. The elements of estoppel are not present. The doctrine of estoppel by deed is not applicable, and cannot be invoked, by one (like SID) who is neither a party nor privy to the extension agreement from which the alleged estoppel by deed arises. 28 Am.Jur.2d Estoppel and Waiver §§ 8, 21, 114, 115; 31 C.J.S. Estoppel §§ 46, 47 at pp. 351–52; and *Liberty Bank of Buffalo v. High Park Development Co.*, 134 Misc. 733, 236 N.Y.S. 194 (Sup.Ct.1929), 227 App.Div. 647, 234 N.Y.S. 832 (Sup.Ct.1929). The New York Court of Appeals has stated:

Estoppels must be mutual; and none can avail themselves of them except parties or privies. [236 N.Y.S. at 201.]

*See Walrath v. Redfield*, 18 N.Y. 457, 460 (1858); *Finnegan v. McGuffog*, 203 N.Y. 342, 96 N.E. 1015 (1911). *See also, Litchfield v. Goodnow*, 123 U.S. 549, 551–52, 8 S.Ct. 210, 31 L.Ed. 199 (1887); and *White v. Croker*, 13 F.2d 321, 324 (5th Cir. 1926), *cert. denied*, 273 U.S. 715, 47 S.Ct. 108, 71 L.Ed. 855.

In *Liberty Bank of Buffalo v. High Park Development Co., supra,* the court held:

Estoppel by deed or by record is operative only to the parties to the deed or record and their privies; *strangers to the deed or record are not bound by, nor can they invoke, the estoppel.* * * * [Many New York cases cited, including *Walrath v. Redfield,* cited above.] [Emphasis supplied.] [236 N.Y.S. at 201.]

Therefore, even if estoppel by deed is applicable here, which it is not as will be shown below, SID is in no position to assert it, because it is neither a party to the extension agreement nor one claiming under a party thereto and was in no way misled by the agreement.

In any event, the quoted language in the extension agreement is standard language used to prevent a mortgagor from claiming he has any defenses or offsets to the mortgage debt. It is strictly for the protection of the mortgagee in exchange for its extending the time for the payment of the debt. The debt is owed to the mortgagee and it makes no sense that the mortgagee or creditor would say that it had no offsets, etc., to a debt that is owed to it. The recited language makes sense only as a disclaimer by the mortgagor of any defenses it has to the debt owed to the mortgagee. It will be remembered that the recited language in the extension agreement states that there are no offsets, etc., *"against* said mortgage notes and mortgages." (Emphasis supplied.) It would not be logical for a mortgagee (creditor), such as Equitable, to agree that it has no offsets, etc., *against* a debt owing to it. The debtor is the only one to which such a statement is applicable.

Black's Law Dictionary 1237 (4th ed. 1951, Rev.) defines "offset" as "a *contrary* claim or demand by which a given claim may be lessened or canceled." (Emphasis supplied.) Webster's New Collegiate Dictionary defines "setoff" as "the discharge of a debt by setting *against* it a distinct claim *in favor of the debtor."* (Emphasis supplied.) See 20 Am.Jur.2d Counterclaim, Recoupment & Setoff § 2. The New York cases hold that "counterclaim" includes "setoffs." *See Seibert v. Dunn*, 216 N.Y. 237, 110 N.E. 447 (1915); *Otto v. Lincoln Savings Bank of Brooklyn*, 268 App.Div. 400, 51 N.Y.S.2d 561 (1944), *aff'd,* 294 N.Y. 798, 62 N.E.2d 236 (1945); and 20 Am.Jur.2d Counterclaim, Recoupment & Setoff § 3. It has been held that the "sole purpose of a counterclaim is to defeat or diminish the demand of a plaintiff" (in this case the demand of Equitable, the assignees and mortgagee). *See Schultz v. Wilson*, 59 Misc.2d 14, 297 N.Y.S.2d 478, 480 (1969); *White v. Bevilacqua*, 273 N.Y. 282, 7 N.E.2d 134 (1937).

The above cases show that the terms recited in the extension agreement refer to situations wherein *a debtor* asserts a claim *against a creditor* in the nature of an offset to reduce the debt. It is obvious that only the debtor or mortgagor can have an "offset, set-off counterclaim

or defense" against the mortgage debt. Accordingly, the recitation in question in the extension agreement can only be a representation by the debtor or mortgagor and not by the creditor or mortgagee (Equitable).

The estoppel by deed theory of SID is further negated by other provisions of the extension agreement, such as:

(e) Mortgagor to pay for * * * such fees as a title insurance company will charge to endorse the existing title policy *to insure the continued validity and priority of the mortgagee's interest in said premises.*

\* \* \* \* \* \*

(i) *That the aforesaid mortgage notes and mortgages* are a valid subsisting obligation upon the premises described in such mortgages, and as such, *are a first lien, as consolidated, upon the premises described therein.*

(j) Except as herein modified and extended, *the terms, covenants and conditions of such mortgages as consolidated, shall remain in full force and effect.* [Emphasis supplied.]

Nothing in the consolidated mortgage was modified or extended by the agreement, except the amounts of the payments on the note and the dates when such payments were to be made. Clause 20 of the mortgage was not mentioned nor changed in any way. Actually, the whole tenor of the agreement was to continue the mortgage in full force and effect as to all its terms and provisions, which, of course, included the assignment in Clause 20.

We hold that Equitable is not barred by the doctrine of estoppel by deed by reason of the recitals in the July 30, 1968, extension agreement from asserting its claim to the restoration award under Clause 20 of its 1954 consolidated mortgage.

As a matter of fact, it is possible that Equitable could have invoked the doctrine of estoppel by deed against SID, because SID unequivocally assigned *all awards* made with respect to the leased premises by anyone to Equitable in two

different 1954 mortgages and ratified and confirmed the consolidated 1954 mortgage in an extension agreement of 1966, all as shown above, all of which was relied on by equitable. Now SID is attempting to contradict the provisions of such mortgages and extension agreement. However, Equitable has not urged this doctrine and we are not required to decide it and do not do so.

SID says that Equitable is not entitled to the restoration award because of our decision in *Beaconwear Clothing Co. v. United States,* 355 F.2d 583, 174 Ct.Cl. 40 (1966). We do not agree. That case is clearly distinguishable from the instant case and is inapposite to our case. In that case, Beaconwear had assigned its claim against the Government to a bank to secure the loans made to finance performance of Beaconwear's contract with the Government. The entire debt was repaid to the bank. Nevertheless, the bank sought to obtain a judgment on the basis of the assignment so as to obtain funds for an unpaid subcontractor and thereby avoid a counterclaim of the Government against Beaconwear. We ruled against the bank because the debt to the bank had been discharged by payment and it no longer had any financial interest in the obligation. SID argues here that Equitable is in the same position as the bank in *Beaconwear.* We do not agree. In *Beaconwear* the bank had been paid in full and had no further interest in the litigation. In contrast, in our case, Equitable's debt has not been paid and it has every right to assert its claim to the restoration award under its assignment and mortgage. If Equitable's debt and mortgage had been paid in full, it would be in the same position as the bank in *Beaconwear* and would have no right to assert a claim to the restoration award, but this is not the situation because Equitable's debt and mortgage have not been paid. Consequently, as stated above, the *Beaconwear* case is not controlling here.

SID argues further that when Equitable executed the extension agreement of July 30, 1968, with the then

owners of the property without the consent of SID, the agreement had the effect of releasing SID from any obligation with respect to the debt and mortgage in favor of Equitable. We do not agree. SID was never liable personally on the bond or mortgage in favor of Equitable. By this argument, SID attempts to invoke the principle that when a creditor extends the date of payment of a note without the consent of the surety or the person secondarily liable, the surety or the person secondarily liable is discharged from all liability on the note. The defect in this argument is that SID was never personally liable directly or secondarily to Equitable on the note. Consequently, when Equitable entered into the extension agreement of July 30, 1968, with the then owners of the property, it had no effect whatever on Equitable's right to claim the restoration award under Clause 20 of its 1954 consolidated mortgage.

SID claims that Equitable has slept on its rights and is not entitled to receive the restoration award in this case because SID filed the suit for the award and won the award and is entitled to it. Again, we find this position of SID without merit. The 1954 consolidated mortgage signed by SID provided in pertinent part as follows:

13a. That a substantial portion of the mortgaged premises are leased to the United States of America * * * and [SID] does hereby agree:

(a) To faithfully abide by, perform and discharge each and every obligation, covenant and agreement of the lease by lessor to be performed; *at the sole cost and expense of the. party of the second part*, [SID] to enforce or secure the performance of each and every obligation, covenant, condition and agreement of the lease by the lessee to be performed; * * *.

(b) *At the party of the second part's* [SID's] *sole cost and expense* to appear in and defend any action or proceeding arising under, growing out of or in any manner connected with the lease or the obligations, duties or liabilities of lessor and lessee thereunder, *and to pay all costs and expenses of the party of the first part, [Equitable] including attorney's fees* in a reasonable sum in any such action or proceeding in which the party of the first part [SID] may appear. [Emphasis supplied.]

As shown above, SID was obligated at its sole cost and expense to enforce all covenants and obligations of the lessee [the Government] specified in the lease. One of such covenants and obligations of the lessee, as provided in paragraph 8 of the lease, was to "restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted" at the end of the lease.

Thus, we see by the specific terms of the mortgage, SID was obligated to see that the Government restored the premises at the end of the lease. In filing the suit against the Government for the restoration award, SID did what it was required to do under the provisions of the mortgage. In any event, Equitable intervened in the suit before trial. Therefore, there is no merit to SID's argument that Equitable slept on its rights.

The attorney for SID alleges that he has an agreement with SID that would allow him an attorney fee of 40 percent of any recovery by SID in this case, and that the court should allow him an attorney fee in this amount. Of course, under our judgment there is no recovery by SID and the 40 percent contract is of no help to its attorney. His claim for an attorney fee is not against the United States but is a contingent claim against an award to SID if there had been such award. The attorney has no definite agreement with Equitable as to an attorney fee. However, despite the fact that his efforts have been adverse to Equitable's claim in this case, Equitable has stated in its brief and through its attorney at oral argument that it is willing to pay SID's attorney a reasonable attorney

fee, but the amount is not stated. We suspended proceedings in the case until the parties agreed upon such attorney fee. However, a reasonable time has elapsed since such suspension was entered and the court has not been furnished with an agreement as to the attorney fee, and, accordingly, it appears that the suspension should be lifted so that this judgment may be rendered and the case disposed of. Under these circumstances, the parties and SID's attorney are left to settle the attorney fee question themselves, because it is a controversy between private parties in which the Government is not involved and this court will not intervene.

The decision of the panel of May 14, 1975, is reversed, and the judgment heretofore entered in favor of SID is hereby set aside and vacated. SID's motion to dismiss Equitable's plea in intervention is denied and the intervention is allowed. The suspension of the case pending an agreement of the parties with respect to a reasonable attorney fee to be paid by Equitable to SID's attorney is lifted, and judgment is rendered granting Equitable's motion for summary judgment for the restoration award in the sum of $292,574.26 to be applied on its mortgage debt. The motion for summary judgment of SID is denied; and the request of SID's attorney for an attorney fee is also denied. Plaintiff's counsel is directed to return to the clerk of this court the transcript of judgment furnished him on July 2, 1974.

NICHOLS, Judge (dissenting):

I respectfully dissent and would still dismiss the intervention as the panel would have done.

This court's *en banc* opinion follows the time honored judicial rule of stating the issues so a reader would conclude that no qualified lawyer outside of St. Elizabeth's would come in good faith to a result contrary to the court's. Equitable's able counsel found in the panel opinion in this case a statement that Equitable had waived its claim against this court's award under Clause 20, a view he

ostentatiously refuted by producing documents which showed Equitable had been asked to do this and had refused. Unless I speak out in dissent, no one will know that the panel found the so-called Clause 20 not to be applicable to the case at all, being at best (from Equitable's point of view) ambiguous and construed otherwise than Equitable's present contention by the prior conduct of all the parties, including Equitable. The offending statement, if not the *mot juste*, plainly referred to this and it required a totally unsympathetic reader not to perceive this was what the panel had in mind when it spoke of a waiver.

See the majority opinion for the text of the Clause. Equitable's counsel freely conceded, both in brief and oral argument, that its sweep was not as broad as its literal language. The court, however, says it would be difficult to write an "assignment more all inclusive * * *" and in a sense that is true. It is so all inclusive it must be narrowed by construction: as written it would apply to an "award" to Mr. Sampson as Jaycee of the Year. (A claim by Equitable to an award of that character would have the support of "legislative history" since the 1947 Clause 20 applied only to awards "by any Governmental or other lawful authority", while the 1954 Clause, here for interpretation, is not so limited.) On the other hand, I can easily conceive of broadening the Clause by making it apply to claims as well as to awards: the consequences of this omission I discuss below. Obviously its interpretation must be intuitive, not literal. It is in fact, if intended to be clear, most ineptly drafted, well below the normal standards of real estate conveyancers.

Equitable freely concedes it applies only to awards to an owner in his capacity of owner or with respect to his ownership. Since the Sampson group (SID) had no ownership interest in the mortgaged premises whatever, when they first sued in this court, or thereafter at any time to date, it would seem some analysis is wanting, as to why the award we have made is an award to an owner

in his capacity as owner or with respect to his ownership. It is an award of damages for breach of a Government contract. Such a problem would not have arisen with the original 1947 form of the Clause, as quoted by the court, since condemnation awards are made *in rem* to any and all owners, as their interests may appear, and no others. Awards for changes in street grade are generally treated the same way. The broadening in the 1954 mortgage raises the problem.

SID and CIC manifestly dealt with the claim that ultimately germinated in our award, as if it did not pertain to ownership. While CIC became owner, and reshuffled accordingly the bundle of rights constituting ownership, SID took the claim which with $10,000, was all it salvaged from its losing investment. Equitable was asked to waive its right, if any, against this claim, and it refused to do so. This the panel did not know until the motion for rehearing. However, the fact falls much short of denial or refutation of SID and CIC's obvious belief that the claim did not pertain to ownership. Indeed, refutation of this was not possible. There was no expression of opposition or alarm by Equitable at the claim falling into the hands of a non-owner for prosecution. SID might have failed to prosecute the claim vigorously for lack of means, or might have set it off against debts it or its partners owed the Government. Equitable's conduct in refusing an express waiver is best accounted for, I think, by the hypothesis that they didn't know what they had, but whatever it was, they were not going to give it away. I do not read its refusals as plain notice it intended to deprive SID of any success it might gain. It was the intervention in the suit that gave that notice and by then SID had passed the point of no return.

As the panel opinion said:

* * * If the former owner and the new one agree that the former owner, not the new one, shall receive any particular award, this shows an understanding by them that the award is not made with respect to ownership, but is a personal asset of the prior owner. Such an understanding would not bind the mortgagee if he was not aware of it, but if he was aware, and made no protest, this would tend to show that his understanding of the meaning of Clause 20 was the same as that of both the new and the old mortgagors. Here the mortgagee not only made no protest, but was a party to a trilateral series of transactions, of which the retention of the restoration claim by the SID group was an integral part. Thus we think the practical construction of all the parties supports [our conclusion].

The opinion elsewhere says that "Equitable tacitly acquiesced in CIC's agreements with SID in their entirety until March 12, 1971 * * * ".

Equitable now says, that it was SID's duty to prosecute the claim, at its sole cost and expense, for the sole benefit of Equitable, with no improvement to SID's equity to anticipate, for it had none, or other benefit of any kind, except perhaps, the satisfaction of duty disinterestedly performed. Not, please note, that it was SID's duty to let Equitable use its name to prosecute the claim. Just the opposite. If, however, Equitable in 1967–68 genuinely believed the above statement of its rights was accurate, it is impossible to believe it would have done nothing effective to protect and further them against obvious jeopardy. Though this is the bizarre result, (unless and to the extent that Equitable pays a counsel fee for the trial in this court, without visible legal compulsion so to do) antecedently considered, the unlikelihood of SID prosecuting the claim gratuitously for Equitable would have been large. The latter's bare intervention in the suit, leaving prosecution wholly to SID, was not just the minimum, it was far below the least that might have been expected if it really believed the award would be its own. Until intervention, Equitable said and did nothing to refute the obvious and well founded belief of SID and CIC that the claim was not by an owner

with respect to his ownership, and therefore not under Clause 20.

It is well established law in this court that the conduct of the parties to a contract may not only interpret an ambiguous clause, but may even overcome plain language. *Gresham & Co. v. United States*, 470 F.2d 542, 200 Ct.Cl. 97 (1972), and cases cited. By their conduct SID and CIC displayed their view that the claim against the Government, prosecuted in this suit, was outside Clause 20. It is now clear there existed no express understanding, with Equitable as a party, to that effect, but such an express understanding is not required when the issue is contract interpretation. Equitable knew the others had so agreed.

Equitable of course was entitled to have the Government waste made good, but this was apparently done with new capital long before the claim herein was decided.

The court refers to clauses obliging SID to enforce the Government's lease obligations and to "appear in and *defend*" (emphasis supplied) any litigation relating to the lease. I question what effect this Clause had after SID ceased to be an owner. The parties seem to have hitherto supposed that Clause 20 was the only one that might have remained alive as to SID after that date. The confining of the Clause to defense of suits is significant.

The final curious thing about Clause 20 is that though it assigns awards, it does not assign claims. It looks as if textually SID had a perfect right to deal with the claim as its own, so long as it was just a claim, to decide not to prosecute it, or to set it off against any debt it might owe the Government. (Equitable's assertion of a right to gratuitous prosecution of the claim by SID rewrites Clause 20.) If SID had received a pay-

ment from the Government for restoration damages, without suit, it does not look as if Equitable would have had any right to it under Clause 20. Similarly if, after suit was brought, the Government made a settlement payment on condition of dismissal with prejudice. If the word "award" in Clause 20 means, besides condemnation awards only others of an *in rem* nature, the apparent absurdity is accounted for. The taker initiates and controls the action and an award to an owner in some amount is assured. The claimant doesn't have to prosecute, the only problem, normally, for the condemnee being to go in and establish he is entitled to all or part of the deposit in the court registry, as owner or one of the owners. The draftsman, in dropping out his reference to condemnations, may have been intentionally vague as to what else was covered, whether, specifically, *in personam* claims the claimant has full control of and must prosecute throughout if they are to ripen into awards.

At any rate, if I were a mortgagee and desired an assignment that was "all inclusive, * * * comprehensive * * and * * * unambiguous" in the court's words, I would be far from satisfied with the Clause here under review. I believe the interpretation given by the majority cannot be sustained by the language itself, or the surrounding circumstances, or the conduct of the parties.

The other arguments in the majority opinion I am not disposed to contest as they seek to demolish alternative points in the panel opinion that were relatively weaker than the interpretation point I considered and now consider crucial. It is a good idea both in advocacy and adjudication, to develop your strong point and leave unstated your alternative weaker ones; otherwise you can expect your strong point to be ignored, while pages are devoted to refuting the others.