**ROMALA CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 609–87C.

United States Claims Court.

May 18, 1990.

John M. Lisko, Waynesboro, Pa., for plaintiff.

Martha H. DeGraff, with whom were Asst. Attys. Gen. Stuart M. Gerson, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant; Gary Shapiro, U.S. Postal Service, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action for breach of contract, brought under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982) ("CDA"). Romala Corporation contends that the Government improperly terminated a contract between it and Romala for the construction of a United States Postal Service ("Postal Service" or "Government") facility in Dragoon, Arizona. After trial, and consideration of the applicable law, the court concludes that Romala is not entitled to recover.

## BACKGROUND

Sometime in 1984 the Postal Service, Western Region, determined that a new postal facility was needed in Dragoon, Arizona. The project was handled by the Real Estate and Buildings Department, out of the Los Angeles Field Office. On September 1, 1984, the Postal Service published two documents, one titled an "Advertisement for Sites," the other an "Advertisement for Bids for Space." The former stated that the Government wished to rent a site for a postal facility. The companion advertisement for space provided that bidders had to submit with the bid:

> a plot plan showing land location and dimensions, and locations of buildings thereon, driveways and parking areas, abutting streets and alleys and width thereof together with a floor plan of the interior space offered, showing dimensions, offsets, doors, windows, partitions, ceiling heights, columns, and other pertinent information.

That advertisement also had checked a block with the following statement: "Bids offering existing space *only* will be eligible for consideration." (Emphasis in original.) The alternative block, left unchecked, read as follows: "Bidders may offer either existing space, space to be modified, or facilities to be constructed." While only existing space would appear to have been sought, the advertisement for space also contained the following: "If new construction or major remodeling is proposed, specifications, including a finish schedule, and a drawing of the proposed front elevation shall accompany the bid." As will be discussed below, other indicators lead the court to conclude that the parties mutually agreed to ignore the advertisement's limitation to "existing space."

The advertisement for space indicated the area within Dragoon that would be acceptable as a site. It also recited that the basic lease term was for a period of 10 years, with four possible five-year renewals at the option of the Postal Service.

Contemporaneously with the issuance of these advertisements, the Postal Service also published a brief notice in various journals. It was captioned: "The U.S. Postal Service solicits bids to provide space and/or lands for a building of 1400 sq. ft. Facility name: Dragoon Main Post Office. City, state: Dragoon, AZ." The notice indicated a willingness to consider six options, in no particular order of preference: 1) expansion of existing space; 2) replacement building; 3) land for lease; 4) land for purchase; 5) leased factory-built construction; or 6) leased construction. Plaintiff's President, B.J. Roberts, Sr., saw the notice, and requested a bid package.

The standard bid package consisted of two parts: 1) a ring binder consisting of general provisions and comprehensive and detailed specifications; and 2) a series of blueprint drawings of a proposed building. The general provisions iterated the six options in the notice. They also contained the following provisions:

The successful bidder shall furnish this publication together with all applicable drawings and details to his architect to be used as the basic criteria for the development of complete working drawings and specifications.

\* \* \* \* \* \*

The USPS drawings and standard details, etc., as prepared by the U.S. Postal Service, which form a part of the bidding documents, indicate physical dimensions of the building and USPS requirements. The lessor shall comply fully with drawings and related construction requirements supplied him by the USPS.

\* \* \* \* \* \*

Standard details and applicable requirements prepared by the U.S. Postal Service will be made available to the bidders by the U.S. Postal Service Field Office Official. Applicable standard details shall be incorporated and made a part of the final working drawings by the Lessor's Architect/Engineer.

The specifications contained, among other things, extensive detail as to architectural requirements, heating and air conditioning, electrical wiring and equipment, and requirements for grading, drainage, paving and landscaping.

Roberts founded Romala in 1961. Since that time, Romala has bid on approximately 75 Postal Service facilities, and has built 24. Of these, about 12 were built from a single "prototype" design. After reviewing the bid materials for the Dragoon facility, Roberts decided that rather than utilizing the Government drawings, he would respond by offering to build and lease to the Government his prototype building. Roberts testified that he contacted Daniel Egdal, Realty Specialist in the Los Angeles Field Office, to enquire about the project. Egdal has been listed on the notice and the advertisements as the appropriate contact person. Because there was no existing space in Dragoon, Roberts wanted to know if new construction would be responsive to the advertisement. He testified that Egdal told him to bid his prototype as if it were existing space.

On October 11, 1984, Romala timely submitted an executed "Agreement to Lease," a standard form designated by the Postal

Service for responding to the advertisements to bid. Romala offered to lease space for both the basic ten year lease term and subsequent five year renewal terms at an annual price of $16,800.00. By this time, Romala had already secured options to purchase land in virtually the entire portion of Dragoon which lay within the area designated in the advertisement for space.

Paragraph 10 of the main body of the agreement, "Plans and specifications," reads in its entirety as follows:

The undersigned specifically acknowledges Paragraph 21, Design and Approval Requirements, beginning on page 5 of the General Conditions to form 7400.

Within 60 days after having received his copy of the "Agreement to Lease" the lessor shall submit four (4) sets of the preliminary plans and specifications as adapted to the specific site by the lessor's [architect/engineer] firm. This submittal shall be at the 30% design stage. A final plan review shall be made at the 100% design stage prior to the commencement of construction.

Romala's agreement was a deviation from the standard form lease agreement in two respects. The form agreement incorporated an attachment of general conditions. Roberts struck through part or all of five paragraphs in those conditions. Paragraph 21, referred to by paragraph 10, is entitled "Design and approval requirements." The opening sentence, which remained after Robert's editing, provides as follows: "(The following clause is applicable (1) except to the extent otherwise specified, or (2) unless complete working drawings and specifications are furnished by the Postal Service.)" Paragraph (a), requiring the employment of an architect/engineer, was stricken. Paragraph 21(b), setting forth, *inter alia*, requirements for local code adherence, lessor responsibility for proper design, and coordination of the various components of the project, were not stricken by Roberts. In addition, this paragraph called for certain certifications by an architect/engineer. Roberts testified that he believed the requirements of paragraph 21(b) were not applicable in view of his

deletion of paragraph 21(a). Also left in the contract was paragraph 21(e), which provided that:

Approval by the Postal Service of any drawings and specifications constitutes approval of general arrangement only and is not to be construed as waiving or changing any requirements set forth in this Agreement to Lease unless a deviation, waiver or other change is specifically identified and approved by the contracting officer.

The second element of Romala's agreement which was non-standard was its incorporation of a letter, dated October 11, 1984, in which Romala stated several additional elements of the offer. Item III. C. of that letter provided that "Romala is submitting drawings of a prototype we have constructed over a period of years for the U.S.P.S. Attached is a letter of 6/9/82 over signature of Dave W. Dogan, Director, Office of Real Estate." The Dogan letter, dated June 9, 1982, indicates that the Postal Service would allow plaintiff to bid his prototype building for a project being considered by the Bala Cynwyd, Pennsylvania, office, subject to paragraph 7 of the standard form advertisement for bids for space. That paragraph gives great flexibility to the Postal Service in considering bids. It provides that "[a]ny award made under this advertisement will be made to that responsible bidder whose bid is most advantageous to the Postal Service, price and other factors considered." It enumerates a number of "other" factors. The same provision is present in the advertisement at issue.

The letter also stated the following:

. . . .

D. Romala will supply your desired floor plan as offered in your bid package.

. . . .

F. Romala desires to use masonry walls—furred out and finished as per our drawings. This will equal R–19 insulation.

G. We offer heat pump installation; also evaporative cooler which is efficient in this area.

H. Septic system is a necessity in Dragoon, AZ.

I. With heat pump operation, the mechanical room can be used for more storage. Our air handler will be installed in attic area. Pull down steps offer accessibility to service unit.

. . . .

K. Note our sidewall construction (interior). We cover with 20 ga. steel over particle board to the 4' wainscoting height. . . .

M. Romala will follow your interior ceiling drawings and electrical lighting, etc. drawings; also exterior lighting as you suggest.

Incorporated as part of Romala's October 11 submission were floor plans, an overhead plan of the general electrical equipment, four side views of the building, and photographs of a prototype building erected elsewhere. The prototype plans Romala submitted were not altered with respect to the Dragoon site.

Prior to this time, Romala had been selected by the Postal Service to build facilities using the same prototype. Plaintiff introduced two such contracts at trial. One was in Mapleton Depot, Pennsylvania. The other was in Fort Loudon, Pennsylvania. In neither contract, however, was there a provision similar to paragraph 10 of the contract at bar, in which the contractor was required to submit plans for approval at the 30% and 100% design stage. In two other projects in which Romala built its prototype, Timberville, Virginia and Orbisonia, Pennsylvania, the applicable contracts precluded construction unless the contracting officer gave written approval of "final drawings and specifications." Roberts testified that Romala got such approval for the prototype plans. All four of these projects were controlled by a different field office of the Postal Service than the contract at issue. Roberts also testified that Romala submitted the prototype plans in an unsuccessful effort to get the contract for construction of a postal facility at Sonoita, Arizona, a project also controlled by the Los Angeles Field Office.

Both Roberts and Egdal testified that they had numerous telephone conversations during the period between October 1984 and March 1985. This was in part prompted by the fact that Romala was the only bidder on the project. Roberts states that there was no mention of the contract requirement of 30% and 100% drawings during these conversations. Egdal disputes that. He testified that he told Roberts the plaintiff's plans would be reviewed at different stages. He also testified that the two men discussed whether the plans as submitted were 100% plans. Roberts said they were. Egdal testified that he told Roberts that he did not think the prototype plans would be treated as 100% drawings in the Los Angeles Field Office, but that he agreed to work with Romala since Romala was the only bidder. Egdal also testified that prior to acceptance by the Postal Service of Romala's offer, it was his understanding, expressed to the Contracting Officer, that Romala's plans would be utilized as 30% drawings. This is confirmed by a memorandum dated March 27, 1985. Egdal testified that the memorandum accurately reflects his conversations with Roberts: "[Roberts] agreed we could use [the prototype plans] as a 30 percent plan and he submitted a site plan from our bid pack but it also says that he will need to submit a new site plan with elevations, drainage, etc. . . . The understanding was that we would take his prototype and he would adapt it to meet the specifications of our bid pack."

Egdal testified that he set up a telephone conference during this period between Roberts and Oscar Fernandez, a project manager in the Design and Construction Branch, in order for Fernandez to explain what was entailed in a 100% submission. Egdal listened in on Fernandez' side of the conversation.

On March 29, 1985, the Contracting Officer, Richard Anderson, Acting Manager of the Los Angeles Field Office, Real Estate Branch, accepted the agreement to lease. The executed agreement was mailed to plaintiff and was received on April 2. On March 28, Anderson had also written a letter to Roberts informing him that Romala had been awarded the contract on his

terms. The letter went on, however, to call attention to paragraph 10 of the agreement:

> Your attention is invited to Paragraph 10 of the Agreement to Lease, which states that 4 sets of working drawings will be submitted to the Contracting Officer, Los Angeles Field Office, at 30% and 100% design stages. *Construction will not commence until you have received approval of the construction drawings from the Contracting Officer.* Please be reminded that the plans you attached to your proposal are being submitted to our District as 30% plans. There may be considerable changes required to meet local policies for the plans and site to be acceptable as 100% plans.

(Emphasis in original.) Although this letter was signed before the agreement was fully executed, it was sent separately from the agreement and did not arrive until April 6.

Roberts responded to the March 28 letter with a letter of his own dated April 10. In it, Roberts indicated pleasure at receiving the contract award, but took issue with the language quoted above: "Romala, in submitting its bid, outlined in paragraph 2, form # 7400, the intent of our bid by submitting our letter of 10/11/84 as part of our bid in addition to our prepared drawings, etc. Therefore, we have bid these plans as 100% drawings." The court notes that the October 11 letter makes no reference to the prototype being considered as a 100% submission.

The parties thereafter began a series of discussions and other communications in an effort to reach agreement on a useable set of plans. During this time Romala exercised its options to purchase the land necessary to build the facility.

Egdal testified that he was surprised with Roberts' letter of April 10, since Egdal still assumed it was understood the prototype plans would be considered as a 30% submission. In the margin of Roberts' letter he wrote a note, "Can we use these?" Evaluation by the Government's technical personnel had already begun in January in the design and the management branches of the Los Angeles office. In April Romala's plans and drawings were also sent to Jack Harmon, Manager of the Building Management Engineering Office in Phoenix, Arizona. In a cover letter from Vincent Maciorski, the acting manager of the Los Angeles Real Estate and Buildings Office, Harmon was told that Roberts "has used them, he says, as 100% plans in other parts of the country. I advised him that we would review them and let him know."

On May 1, Maciorski received the following written comments from the design and construction branch:

> The proposed drawings for a main post office, in Dragoon, AZ have been reviewed. The following comments are offered:
>
> 1. The insulation does not meet USPS energy requirements.
>
> 2. No allowance has been made for seismic in the brick veneer or the wood frame, wood truss design.
>
> 3. The drawings are incomplete i.e. shed roof missing in elevations and details.
>
> 4. Toilet room does not meet USPS handicapped requirements.
>
> 5. There are no specifications—notes on the drawings do not satisfy specification requirements without going deeper and using additional time in reviewing these documents, I would, in summary, say the drawings are inferior, inadequate and would not produce a quality building satisfying USPS standards.
>
> I recommend you reject the offer.

The letter was signed by Philip Frank, Manager of the Design and Construction Branch.

On May 15, Maciorski received the results of the review of the Building Management Engineering Office, signed by Harmon. The three page document recites 31 criticisms or requests for changes in Romala's submission. In the opening paragraph, Harmon writes: "We have reviewed the incomplete plans submitted and do not consider these as 100% drawings. These are 10% drawings at best. We request 30% design and review and then 100% plans plus review."

Egdal was informed of the reactions of the technical staff, and called Roberts to tell him that Romala's plans were inadequate. There were a number of telephone calls between Roberts and Egdal during this period. Egdal testified that Roberts agreed to reconsider his own drawings in light of the Government's original drawings and bring Romala's plans "up to our standard." Egdal sent another complete set of Government blueprints to Roberts. Romala made some revisions to the blueprints and submitted them. At that point Egdal was expecting either that Romala would abandon its prototype altogether and adopt the Government's drawings, or make more substantial changes to the Romala plans. In a July 1 letter, Roberts wrote Egdal: "Romala's bid was based on our drawings submitted with our bid, but after our discussions we conceded to using your drawings (a signed copy attached) as 100% submission. We called your attention to various changes as noted on each drawing in red."

Romala's revision of the Government's drawings was referred to Oscar Fernandez, a project manager in the design branch. Fernandez considered the markup unacceptable as a 100% submission, but made several annotations and changes. The Government's markup was then sent by Egdal, under cover letter dated July 22, back to Roberts. In the letter, Egdal recites:

> You have now submitted a single U.S. P.S. plan with some changes annotated in red, which you identify as 100% submission. We sent this plan to our Design and Construction Section for review. They have spent considerable time annotating the plan so that it will be acceptable to fit the lot size and shapes. This is a job that your architect should really have done and submitted to us for review. At any rate, we would like to get this job done as soon as possible, and therefore, our Design personnel spent considerable time to prepare this set for you. *Please*, note the requirements that we need in the notes, such as grading plans, drainage, etc. Please see General Notes on title sheet.

> I do hope we can get this job started soon.

(Emphasis in original.)

On August 21, Roberts wrote the Contracting Officer, Anderson, expressing frustration with what he considered was the Government's failure to adequately respond to his July 1 letter, and with his contacts with Egdal: "We are very disgusted with our attempt to satisfy Egdal that we are sincerely considering that our original bid design be accepted."

Egdal testified that he wrote Roberts on September 5, suggesting Roberts might want to come to the Los Angeles office to resolve the problem. A copy of this letter is not in evidence.

On September 9, Roberts wrote Egdal a letter which recites, in part, the following:

> I. In view of the continuous lack of communication, Romala, by this letter advises you that the facility to be constructed in Dragoon *will be as per our drawings as submitted with our bid.*
> II. Referring to the letter of 3/28/85, over the signature of R.W. Anderson, Acting Manager, Contracting Office, paragraph two refers to 30% drawings and 100% drawings. Romala consistently, by phone and letter has requested a detailed explanation of "100% drawings." We have never received an explanation.
> . . . .
> VIII. This is our *last request* to your office to clarify what we need to perform our responsibilities, start construction and complete this structure.

(Emphasis in original.)

On September 26, Egdal responded to Roberts by letter. Egdal began by setting forth his summary of the contract history. He concluded with the following:

> You have used a plan in the east which was acceptable to them. You were very insistent on submitting this plan with your bid pack. Since you were the only bidder, and I was anxious to get a facility in Dragoon, I finally told you that I would submit the bid with your plan as a 30% submission, but verbally cautioned you, as well as noting in the award let-

ter, that you would have to conform to our requirements as monitored by our Design and Construction Branch. Throughout this period, in addition to the letters we have exchanged, there were a number of telephone calls, including 3–way calls between you, myself, and our Design and Construction Department personnel, who carefully explained to you, and in fact physically sent you, explicit detail on what a 100 percent plan is. Therefore it puzzles me when you accuse us of not explaining to you what we mean by a 100 percent plan.

I do not know of anything else that I can do or say that will remedy this situation. At this time, I must inform you that if we cannot resolve this satisfactorily—which means we must get the proper plans from you—by October 8, 1985, I will take action to default your proposal.

Further telephone calls and correspondence followed. On January 15, 1986, the General Manager of the Real Estate Division of the Postal Service Regional Office wrote Roberts asking him to consider the following stipulation:

The project may proceed provided that: (1) an architect currently registered as such in the State of Arizona approves the construction drawing and plans; and then

(2) the appropriate local government's building department reviews the drawings and plans and issues a building permit;

(3) and you submit for our approval a list of manufacturers and model numbers of the heating, ventilating, and air conditioning equipment, along with three copies of the drawings and plans of (2) above. Such approval on our part shall not be unreasonably withheld and the result of our review shall be communicated to you by certified mail not less than thirty calendar days after receipt in this office;

(4) all other appropriate requirements of the Invitation for Bids remain in effect.

Roberts responded to this letter through his attorney. The proposed stipulation was rejected. On April 10, 1986 Romala sub-

mitted a claim to the Contracting Officer. On April 21, 1986 the Contracting Officer denied the claim and terminated the contract for default. There has been no reprocurement. Plaintiff filed its complaint in this court that was dismissed without prejudice for lack of proper certification. Romala promptly resubmitted a certified claim to the Contracting Officer. No decision has been issued as to that claim. On September 29, 1987, Romala refiled its complaint. It claims that the termination was without basis and constitutes a breach of contract. Romala seeks to recover approximately $800,000.00 for out of pocket expenses, loss of rental income, the value of the planned building, and for loss of future business.

## DISCUSSION

The parties disagree on what constitutes their agreement. Defendant makes two arguments. First, it contends that the plaintiff's attempt to eliminate parts of paragraph 21 of the Agreement to Lease form are ineffective. It argues specifically that the requirement of an architect/engineer, called for by paragraph 21(a), is of such importance to the underlying solicitation that the contracting officer's acceptance of plaintiff's effort to eliminate the requirement is of no effect. Applicable Postal Service regulations in effect at the time of the solicitation require that, to be considered responsive, bids "must be received as specified in the advertisement, properly executed, and must contain all applicable items indicated in the advertisement, the letter of instructions, and changes to bidding documents issued during the advertisement period." *Realty Acquisition and Management Real Estate Handbook*, § 7–102.1. *See also Postal Contracting Manual*, § 2–404.1. In this case, the bid documents, as well as the form Agreement to Lease, clearly specified that the lessor had to employ the services of a registered architect/engineer.

Defendant correctly points out that bids at material variance from the solicitation cannot be accepted by the contracting officer. *Prestex, Inc. v. United*

*States*, 162 Ct.Cl. 620, 625–26, 320 F.2d 367, 371–72 (1963). Nor is the Government estopped from disavowing the actions of a contracting officer in accepting a bid in violation of statutes and regulations. *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 564–65, 81 S.Ct. 294, 316–17, 5 L.Ed.2d 268 (1961); *Alabama Rural Fire Ins. Co. v. United States*, 215 Ct.Cl. 442, 452–53, 572 F.2d 727, 732–33 (1978). The only provisions to which defendant points, however, are the Postal Service regulations cited above, that merely require a responsive bid. The real question is whether the use of an architect/engineer is an essential requirement for contract performance. The court concludes that it is not.

While it is possible that many of the problems which arose during contract negotiations and performance could have been avoided if plaintiff had employed an architect/engineer, it is far from clear that the work could not satisfactorily be done by others. Government technical staff may have been frustrated by what they perceived to be Romala's nonresponsiveness, but they nevertheless accepted at face value plaintiff's submissions. The problem was not who prepared the drawings; the problem was what the drawings showed or failed to show. There was no evidence that involvement by an architect/engineer would have qualitatively changed Romala's submission. To the extent defendant contends that plaintiff's plans and drawings were deficient, the appropriate vehicle for making that argument is in the context of the breach of contract claim.

■ Defendant also contends that the Contracting Officer's letter of March 28, 1985 became part of the contract terms. That letter clarifies the position of the USPS that the Romala prototype would be considered as a 30% submission, and generally calls attention to the requirement of paragraph 10 that plans would be submitted at both the 30% and 100% stage. As discussed above, while that letter was apparently prepared before the Contracting Officer executed the Agreement to Lease,

it arrived at plaintiff's headquarters four days after the agreement.

■ At the outset, the court notes that if the March 28 letter is to be considered as the Government's acceptance, and if it deviates from the agreement in any material way, then it could not constitute an acceptance at all. A purported acceptance which adds qualifications is not an acceptance, but a counter-offer. Restatement (Second) of Contracts ("Restatement") § 59 (1979). That eventuality need not be confronted, however, for two reasons. First, the court concludes that acceptance occurred when the executed agreement was sent to Romala. It is settled in this court that an unqualified acceptance is effective when it is communicated to the offeror. *Slobojan v. United States*, 136 Ct.Cl. 620, 625–26 (1956); *cf.* Restatement § 63 (acceptance effective when put out of offeree's possession). The Court of Claims has held that when a letter containing an offer of acceptance is mailed, the contract is not formed until the letter is received. *Slobojan*, 136 Ct.Cl. at 626; *Rhode Island Tool Co. v. United States*, 130 Ct.Cl. 698, 703, 128 F.Supp. 417, 419 (1955). The contract was formed, therefore, upon Romala's receipt of the executed agreement, as modified by Romala without objection from the Government. Since acceptance cannot be revoked after it is effective, *Ryan v. United States*, 136 U.S. 68, 86, 10 S.Ct. 913, 919, 34 L.Ed. 447 (1890), the arrival four days later of the March 28 letter was a nullity.

■ More important, however, the court sees no material difference between the expressions in the March 28 letter and the terms of the agreement itself. Paragraph 10 of the agreement requires that the contractor submit preliminary drawings, adapted to the site by an architect/engineer, at the 30% design stage. Romala argues that its redaction of the architect/engineer language from paragraph 21 removed along with it any obligation to satisfy paragraph 10. The court cannot agree. Paragraph 10 creates obligations independent from the design requirements set out in paragraph 21. The parties' conduct clearly demonstrates their belief that

it was possible for Romala to submit site-adapted drawings without the benefit of an architect/engineer. The court concludes that the plaintiff's editing of the agreement can be read to be consistent with paragraph 10, if the requirement for an architect/engineer is ignored. As the Supreme Court taught long ago in *A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 236, 45 S.Ct. 295, 296, 69 L.Ed. 589 (1925), courts should look for ways to harmonize contract documents to preclude results inconsistent with the parties' subsequent dealings.

■ The corollary to the court's analysis is that the contract required Romala to submit plans at the 30% and 100% stage for Postal Service approval. Romala disputes this conclusion. It points out that the original advertisement for space indicated that only existing space would be considered. Without any factual or legal support, Romala asserts that "30% and 100% plans are not required when bidding on existing space." Plaintiff's Pretrial Memorandum of January 22, 1990, at 5. Assuming plaintiff is correct that the requirement of staged submissions is inconsistent with an expectation that the space to be provided was already in existence, the court declines to give any effect to the latter requirement. Egdal testified that the activation of "existing space" block in the advertisement for space was simply a mistake. The block with the following statement should have been checked: "Bidders may offer either existing space, space to be modified, or facilities to be constructed." This is consistent with other elements of the solicitation. The public notice, to which Roberts responded, expressly listed six options, one of which was existing space, and another of which was "leased construction." The package of bid materials which Roberts received contains detailed explanations of those same six options, again, only one of which was "existing space."

Roberts could not have depended on the erroneous marking of the existing space block on the advertisement, since he knew there was no adequate existing space in Dragoon and specifically asked permission to submit plans for his prototype, which called for new construction. Nor can Romala successfully contend that Egdal's alleged statement, "bid it as existing space," constitutes a waiver of the 30% and 100% submission requirements. Initially, the court chooses to believe Egdal that he and Roberts discussed the requirement of submission of plans at two stages. While the March 28 letter was received after contract acceptance, it is evidence, nevertheless, that Egdal and Roberts had been having conversations as discussed in that letter. Given the volume of telephone calls between October 1984 and March 1985 between the two men, it would indeed be surprising, given the subsequent written confirmation that the Postal Service would insist on reviewing submissions, that the subject did not come up earlier. It is obvious, therefore, that both parties mutually agreed to ignore the statement in the advertisement that the space had to be existing. *See Gresham & Co., Inc. v. United States*, 200 Ct.Cl. 97, 118, 470 F.2d 542, 554 (1972).

Romala's follow-on contention is that the parties agreed to ignore the requirement of a submission at a 30% stage, and instead treat the prototype as a 100% submission. Although unnecessary to the result, the court rejects this contention. Roberts was apparently of the sincere belief that his prototype would be considered only at the 100% submission stage. However, the court is persuaded that Egdal and Roberts reached no mutual understanding to that effect. While the court was impressed with Roberts as a businessman and has no reasons to doubt his credibility, it was obvious from his testimony that he was impatient with what he perceived to be bureaucratic considerations. Roberts was less than precise on some points of his testimony. The court is of the view that Egdal, who struck the court as not particularly confrontational or assertive, probably made statements which Roberts, in his eagerness to submit the prototype, and in his growing frustration, might have failed to fully appreciate.

■ In the final analysis, however, it is unnecessary to determine whether the requirement of a 30% submission was waived, or whether Romala's submission was appropriately rejected at the 30% submission stage. If the contract required approval at the 100% stage, and if the Romala's plans and drawings were properly rejected as a 100% submission, Romala cannot recover.

Defendant put on three witnesses in addition to Daniel Egdal to explain the decision to reject the prototype—Oscar Fernandez, John Harmon, and William Usher. Fernandez, a licensed architect, reviewed the prototype at Egdal's request. During his testimony, he gave a definition of what he considers to be 100% plans: "a set of documents in graphic form with notations addressing existing conditions and what the proposed construction would be." Harmon gave a similar definition of 100 percent plans:

> They contain all the different systems; your electrical plans, your H-back ventilation plans, your site plans, contours, landscaping and all of that. They're precise finished plans that you would have a complete understanding between your company and your customer so there would not be any mistakes made.

Usher, an engineer, held a position with the Postal Service as a "Construction Manager/Principal." One of his responsibilities was to review plans for 100% sufficiency. He defined 100% plans as those which have "sufficient quality and detail and completeness to allow any reasonably competent person to bid the work."

Between them, these three witnesses catalogued for the court a number of reasons they considered the plans as submitted not to be 100% complete. All three testified that the plans did not sufficiently show elevation, drainage, and grading. That is, the plans were not site adapted. While Romala's plans gave overall dimensions and distances, and while Romala included photographs and drawings of the side views, they agreed that this was inadequate to demonstrate adaptation to the topography of the particular site. There was no means to judge the relationship between the building, parking lot and street in the abstract with the lot itself. There was no indication, for example, of the elevation of the septic field. Romala's counsel attempted to elicit agreement from Fernandez with the proposition that these concerns could be satisfied, at least in part, by photographs of the surface of the lots in question. Fernandez did not agree, and the court is persuaded that his refusal to consider the photographs as a solution was not fanciful.

The prototype plans did not indicate whether the walls would be reinforced, or whether the concrete block proposed would be filled. The plans did not include plumbing or electrical or hardware specifications. They did not indicate where furnishings such as fire extinguishers would go. Door schedules were incomplete. The plans were unspecific in terms of bathroom fixtures and the heating and air conditioning systems.* There was no indication of the quality of the materials, such as the brick, the concrete, the pavement, the walls, or the paint. The plans did not provide details as to the footers for the foundation. There was no explanation of what testing processes would be employed in curing concrete, or whether there would be compliance with local or federal building requirements.

These concerns did not arise for the first time at trial. It is clear that they were raised by April and May, 1985. Egdal testified that he told Roberts of the concerns, at least in a general way, and offered to meet with Roberts. When Roberts submitted a markup of the Postal Service's plans, the Postal Service replied with detailed notes and questions. There were innumerable telephone conversations about

---

* The Postal Service's own specifications would not provide the needed explanation. Those specifications related to the Service's own proposed drawings, which Romala ultimately chose not to utilize. In addition, the specifications create a number of options for any single feature. The technical staff would not know which option was picked and how it would mesh with other choices if the contractor did not furnish that information.

Romala's submissions. Roberts also had the benefit of Fernandez' explanation of what was necessary for a 100% submission.

■ Roberts did not undertake a point by point rebuttal of the deficiencies asserted. Instead, Romala's primary response to these concerns is that its successful use of the prototype as a 100% submission on previous Postal Service contracts demonstrates that it was improper for the Postal Service to treat the submission as incomplete with respect to the Dragoon site. Romala relies on the previous course of dealing between it and other divisions of the Postal Service in the eastern United States. It points to Section 223(1) of the Restatement: "A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Romala also points to Comment b, which recites that "a course of dealing may become part of an agreement either by explicit provision or by passive recognition, or it may guide the Court in supplying an omitted term.... There is no requirement that an agreement be ambiguous ... nor does it require that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing." Romala cites *Tibshraeny Bros. Const., Inc. v. United States*, 6 Cl.Ct. 463 (1984), for the related proposition that ambiguous language in a contract can be given clarity by reference to the parties' prior dealings.

Cases in this court and its predecessor court discussing the application of prior course of dealings between the Government and a contractor compare the previous conduct with the circumstances at bar, and also look to whether the contractor has demonstrated justifiable reliance on the previous conduct. *Southwest Welding and Mfg. Co. v. United States*, 206 Ct.Cl. 857, 513 F.2d 639 (1975); *Boyd Int'l Ltd. v. United States*, 10 Cl.Ct. 204, 206 (1986); *see Gresham*, 200 Ct.Cl. at 117–18, 470 F.2d at 554. In this case, however, the court finds that the evidence presented did not establish that the parties' prior conduct

resulted in a common understanding. The most that can be concluded is that, with respect to differently worded contracts and different locations, other field offices of the Postal Service allowed Romala to build its prototype. Such conduct is of insufficient similarity and repetitiveness to constitute an understanding that the prototype would always be unquestionably accepted in future contracts as a 100% submission. *See Underground Const. Co., Inc. v. United States*, 16 Cl.Ct. 60, 66–67 (1988). To adopt Romala's view would mean that the Postal Service could never question the adequacy of the prototype plans, regardless of differences in contract language or local site conditions.

Roberts also testified that, in his past dealings with the Postal Service, details of his plans were worked out during contractor meetings held by the Service. This fact may, in part, explain why the prototype plans were accepted by other field offices. Roberts explained that no such meetings were held in the case of the Dragoon facility, and thus he had no opportunity to explain his plans. The court cannot accept that circumstance as either a response to the particular concerns raised by the Postal Service, or as an excuse for lack of detail in this case. Regardless of Robert's expectations, and regardless of the terminology given to meetings and other contacts between the parties, the record is clear that Romala had more than adequate invitation and opportunity to provide detail to the plans.

In *Darwin Const. Co., Inc. v. United States*, 811 F.2d 593 (Fed.Cir.1987), the Federal Circuit discussed with approval the standard utilized by this court in reviewing decisions by a contracting officer to terminate a contract: "there is no doubt that in the exercise of its CDA jurisdiction under 28 U.S.C. § 1491, the Claims Court has held that it is authorized to set aside the decision of a contracting officer where it is established that his decision was arbitrary or capricious." *Id.* at 597. In applying that standard in this case, the issue is not, ultimately, whether the prototype plans were adequate, or could be made adequate, but whether the termination for default

was arbitrary or capricious. The court concludes that it was not. There was ample justification for the Postal Service's material questions about the prototype plans. While it may well have been possible for plaintiff to answer those questions in a satisfactory way, it did not do so after generous opportunity had been provided. It was Romala's decision to revert to the unadorned prototype drawings. Having previously been told by competent technical staff that those drawings were insufficient, it was not unreasonable for the Contracting Officer to terminate the contract. To do so did not constitute a breach of contract.

Having concluded that the termination was proper, it is unnecessary for the court to address defendant's further arguments concerning waiver and the lack of entitlement to certain types of the damages claimed.

### CONCLUSION

The Clerk is ordered to dismiss the complaint. No costs.